191 So.2d 917 (1966)
E.E. MORGAN, Morgan Investments, Inc. and 3100 Corporation
v.
UNITED STATES FIDELITY AND GUARANTY COMPANY.
No. 44074.
Supreme Court of Mississippi.
November 7, 1966.
Suggestion of Error Overruled December 5, 1966.
Cox, Dunn & Clark, Jackson, for appellants.
Butler, Snow, O'Mara, Stevens & Cannada, Roger C. Landrum, Jackson, Snow, Covington, Temple & Watts, Meridian, for appellee.
*918 INZER, Justice.
This is an appeal by E.E. Morgan, Morgan Investments, Incorporated and 3100 Corporation from a final decree of the Chancery Court of the First Judicial District of Hinds County, wherein appellee, United States Fidelity and Guaranty Company, was awarded money judgments and other relief.
The main basis for the suit instituted by United States Fidelity and Guaranty Company (hereinafter called Guaranty Company) against appellants (hereinafter referred to as Morgan), and many other defendants including R.W. Hyde, Jr. and six corporations owned or controlled by Hyde, was certain agreements of indemnity contained in bond applications executed by Morgan and Hyde in favor of Guaranty Company. The bill of complaint alleged that Hyde and Morgan were partners engaged in certain features of Hyde's contracting business, that Guaranty Company had executed payment and performance bonds totaling several million dollars for and on behalf of Morgan and Hyde, and that Guaranty Company had sustained losses on these bonds. The bill as amended prayed for injunctive relief, specific performance, marshaling of assets, a money judgment or decree for its losses on the bonds, insurance premiums on certain insurance policies, and attorney's fees.
Appellants answered and denied that a partnership ever was activated between Morgan and Hyde. The signatures on the bond applications were admitted, but the validity of the bond applications was denied, both on the ground of constructive fraud or fraud in law and the ground of lack of consideration. Appellants denied that Guaranty Company was entitled to any relief against them. In the alternative, they averred that if any liability existed, it was secondary to the liability that Guaranty Company assumed without appellants' indemnification. As a further alternative, appellants averred that such liability was pro rata only and should be apportioned equitably. No issue as to the amount of Guaranty Company's losses was raised.
Hyde also answered and denied that the partnership ever was activated. Hyde admitted liability, but raised certain issues as to the amounts claimed.
After a lengthy hearing, the chancellor found that there was no fraud, and that Morgan and Hyde were partners and as such executed the bond applications on the bid contracts. He found also that under the terms of the indemnifying agreement Morgan was liable for attorney's fees. He found that Guaranty Company was entitled to recover the full amount sued for from Hyde and Morgan.
The decree awarded a money judgment in favor of Guaranty Company against Morgan for the sum of $2,642,568.35, plus the sum of $201,393.76 for insurance premiums. The decree awarded also a joint and several judgment against each appellant corporation in the sum of $377,124.99. The liability of Hyde and the corporations under his control was fixed, and a money judgment was awarded against them for an amount in excess of the judgment against Morgan. The attorney's fees were fixed at $125,000, and a judgment was awarded against Morgan for that amount. The decree awarded certain other relief not necessary to detail here.
The primary contention of Morgan is that the chancellor was in error in finding that there was no fraud on the part of Guaranty Company. In fact, it is argued that the chancellor's opinion reflects that he completely misconceived Morgan's defense of fraud in law. We do not so construe the chancellor's opinion. Inasmuch as the chancellor determined the factual issues in favor of Guaranty Company, we must consider the evidence in the light most favorable to Guaranty Company.
The facts are as follows. Hyde had been in the construction business since 1947. Over the years he had engaged in the general contracting business and had performed *919 numerous large construction jobs. Sometimes he contracted as an individual, and at other times he contracted through various corporations under his control. E.E. Morgan also was an experienced contractor who had large financial resources and was experienced in financing other transactions. By the middle of the year 1957 Hyde had expanded his operations to the point that he did not have the necessary financing to obtain bonds for more and larger contracts that he desired to bid on. In his operations he was performing two types of contract jobs. They were bid jobs, obtained as a result of competitive bidding, and negotiated jobs, on which the contract price was negotiated between the owner and the contractor without competitive bidding. Since Hyde had reached the point that he did not have financing to enable him to secure bonds to further expand his business, he worked out an arrangement with Morgan, whom he had known for many years and who had large financial resources, to join with him in order that he might further expand his business. This agreement was reduced to writing as articles of partnership in the early part of May 1958, the effective date being January 1, 1958. This partnership agreement covered bid jobs. A separate agreement was entered into relative to the negotiated jobs. Under this agreement Morgan was to receive two and one-half per cent commissions for signing the application for the bonds as indemnitor or guarantor. The facts leading up to these agreements are those upon which Morgan contends the fraud in law arose. They will be discussed later in this opinion.
A copy of these agreements was furnished to Guaranty Company, and thereafter Hyde and Morgan had no difficulty in getting Guaranty Company to write the contract bonds. The bonds were issued in the name of Hyde or corporations controlled by him. Morgan signed the applications for bid job bonds individually and as copartner, and where the jobs were negotiated, he signed the applications as indemnitor. Under this arrangement Hyde and Morgan obtained numerous construction contracts involving many millions of dollars.
On March 21, 1960, Morgan and Hyde entered into an agreement terminating the partnership as to future jobs. This agreement recited that on January 1, 1958, they had created the partnership and that it had served its usefulness, and that they desired to terminate the partnership and settle their affairs. The agreement listed the jobs then in progress, and Hyde agreed to assume liability for the obligations of the partnership, including any bond liability of Morgan. In the accounting between Morgan and Hyde after the dissolution of these two agreements, Morgan received in excess of $500,000 in cash and $316,000 in notes executed by Hyde in his favor.
In 1961 Hyde started having serious financial trouble, arising at least in part from the large construction contract known as the Keystone Dam Project in Oklahoma. Hyde notified Morgan and Guaranty Company of his difficulty. Conferences were had relative to the situation between Morgan, Hyde and the representatives of Guaranty Company. Guaranty Company took the position that it would not provide funds for the contract as long as there was a solvent principal in the bond, that principal being Morgan. Morgan then assisted Hyde on the Keystone job, after he had secured from Hyde other security.
Hyde became so short of working capital that many bills for labor and materials on various other jobs were unpaid. These claims were reduced to judgments rendered against Guaranty Company, and Guaranty Company paid them after notice to Hyde and Morgan. The amounts paid up to the time of trial of this case were the basis of the judgment against Morgan and Hyde. There were still other claims pending which had not been reduced to judgment at the time of the trial.
Determining whether the chancellor was in error in failing to find that the evidence established fraud in law on the part of Guaranty Company requires us to detail to *920 some extent the evidence on this point. There are three principal actors insofar as this scene is concerned. They are Morgan, Hyde, and Lyle Bates, a representative and agent of Guaranty Company. Bates was a surety underwriter and a vice president of F.W. Williams Corporation, the general agent for Guaranty Company in Mississippi. Bates had known and dealt with Hyde since the time he went into the contracting business. He had also known and dealt with Morgan when he was active in the contracting business.
Morgan testified that prior to March 19, 1958, he had not discussed with Hyde any business arrangements whereby he would assist Morgan in securing larger contracts. Morgan said that on the above date Bates secured an appointment for Bates and Hyde to come to his office to see him, and that about one-thirty in the afternoon Hyde and Bates came to his office. On this occasion Bates told him that he, Bates, wanted Morgan to assist Hyde with additional bond credits over and above a ten million dollar line of credit Hyde had with his company. Bates explained to him that Hyde operated in two different categories. One was ordinary bid propositions where he bid in competition with other companies. The other was negotiated gas contracts, and on these he set his own price, resulting in his making a world of money in this field. Morgan said he told Bates that he did not know anything about Hyde's business. Bates replied that Hyde had been most successful in all his operations, that he had a good organization with plenty of equipment, and he only wanted Morgan to sign a simple indemnity agreement on the negotiated jobs, but wanted him to cosign the bid jobs. He said his company had just made Hyde's bond on a $2,000,000 negotiated gas job in Mobile, Alabama, and for them to get together and date their contract to include that job. Morgan said Bates also informed him that Hyde had a lot of work lined up and was going to need bond credit over and above the $10,000,000 line of credit he had with Guaranty Company, in order to bid on some projects in a multi-million dollar highway program that was coming up. Morgan said that he relied upon these statements made by Bates, and as a result of these statements he entered into the partnership agreement relative to the bid jobs and the commission arrangement relative to the negotiated jobs. He said also that although the partnership agreement was executed, it was never activated, and that he and Hyde worked out another arrangement in its place. Morgan admitted that he signed the bond applications in question, but denied that he did so as a partner of Hyde. Morgan was specific in his testimony that this was the only conversation that he had with Bates relative to the affairs of Hyde.
It is Morgan's contention that, at the time Bates represented to him that Hyde had a $10,000,000 line of bond credit with Guaranty Company, these statements were false. He contends also that Bates knew at that time that Morgan was at or near his maximum capacity as a contractor and had already spread himself thin. Further, he contends that Bates knew his company had allowed Hyde to make complimentary bids on large contracts which they knew would be high, and that these practices were used to convey the impression that Hyde was financially able to bond larger bids than he actually was able to finance. He contends that these and other matters which Guaranty Company knew about the true status of Hyde's business were concealed from him by Bates, and that had he been advised of the true facts of Hyde's condition, he would not have entered into any agreement to lend bond credit to Hyde. In other words, it is Morgan's contention that when Bates entered the scene and volunteered information concerning Hyde's bond credit and commended Hyde's ability as a contractor, he was duty bound to make a full disclosure. His failing to disclose material facts which would be pertinent to the assumption of the risk by Morgan amounted to fraud in law.
Hyde testified that he had known Morgan for more than twenty years, and that beginning *921 sometime in September he had several conversations with Morgan relative to joining forces. He had an operating company, and Morgan had available bonding and banking credit. These conversations were several weeks apart. During that time, Hyde furnished Morgan with his operating and financial statement for the preceding two or three years. Morgan furnished Hyde with his financial statement for the preceding year. On February 8, 1958, Hyde went to the office of Morgan, and at that time they had a tentative agreement that Morgan would join him on performance and payment bonds. Their arrangement at that time was that Morgan would receive a two and one-half per cent commission of the contract price for executing the indemnity agreements. Hyde said that prior to this meeting Morgan had in his possession his (Hyde's) financial and operating statement. Hyde, upon return to his office, wrote a memorandum relative to their discussion, and, he said, mailed it to Morgan. He had a copy in his file, and this was introduced in evidence. After this meeting until the partnership agreement was executed, Hyde said he kept Morgan fully advised relative to his operations. Hyde did not remember ever being in a meeting with Morgan when Bates was present, and did not recall any meeting on March 19, 1958. He said that after the partnership articles were signed, he and Morgan decided to handle their operations by his selling to Morgan fifty per cent of the stock in Hyde Construction Company, Incorporated, and that they handled their financial transactions through this corporation. Hyde denied that there was a partnership, but admitted writing a letter to Morgan and Guaranty Company on March 21, 1962, in which he made the statement that these liabilities now in question were undertaken during the time he and Morgan were partners.
Lyle Bates testified that as early as September 1957 he was requested to arrange bid bonds on three jobs for Hyde and Morgan. He said Morgan and Hyde told him they had entered into a joint venture to bid on these jobs. He remembered that Morgan came to his office on February 12, 1958, and brought his financial statement. He asked Morgan on this occasion how he and Hyde were going to do the work, and after some discussion, Morgan said that he would prefer to sign each application along with Hyde. Bates said he and Morgan had a definite agreement at that time that Morgan would indemnify Guaranty Company by signing applications on any jobs that Morgan and Hyde were interested in. After that time, Morgan told Bates that he and Hyde had reached a tentative agreement. Later, about March 12, 1958, Bates arranged, at the request of Morgan and Hyde, a bid bond for a $4,000,000 highway contract in Jones County. Bates said he went to Morgan's office on March 19, 1958, to discuss with Morgan the Jones County Project and some other work projects that Morgan and Hyde were considering. He denied that Hyde was with him on this occasion. He said Morgan told him on one occasion, either on March 19, 1958, or earlier, that he had made a thorough investigation of Hyde's affairs, and that he thought it was as fine an organization as there was in this part of the country. Bates said he told Morgan at some time that Hyde had about nine million dollars worth of work on hand, and that Guaranty Company was handling a program for him of about ten million dollars, but he denied that he told Morgan that Hyde had a ten million dollar line of credit with Guaranty Company. He said he and Morgan at some time had discussed Hyde's reputation and his manner of operations, and he had told Morgan they were good. Morgan asked him what he thought about Morgan and Hyde getting together, and he told him he thought they would make a good combination. They were both experienced contractors, and he had only one hesitancy, which was whether they could get along together. Bates said that, after the partnership was formed, he received a copy of the agreement from Hyde, and that from then until he received a copy of the dissolution, he was not advised *922 that they were not operating as a partnership.
It was from this conflicting testimony that the chancellor found there was no fraud, actual or constructive. It is apparent that the chancellor did not accept the testimony of Morgan. Although Morgan testified that he relied on the statements made to him by Bates, and that such statements were a contributing factor in his entry into the agreement with Hyde resulting in his executing the indemnifying agreements, the chancellor apparently believed this was not true. The chancellor, after discussing the situation of the parties and the facts as he saw them, had this to say about the question of fraud:
This Court finds that there was no misrepresentation and no fraud practiced by Lyle Bates, representing the complainant, on the defendant, Ed Morgan. Not only is misrepresentation and fraud not proved by a preponderance of the evidence, but it hasn't been proved by any of the evidence, in this Court's opinion.
Morgan's statement that he relied on the statements of Bates is contradicted. The proof shows that on November 17, 1961, Morgan filed a suit against Hyde wherein he swore that he and his two appellant corporations had become indemnitors for Hyde by arrangement with Hyde, in order to enable Hyde to make the bonds with Guaranty Company. Prior to that time, on June 16, 1961, in an agreement with Hyde relative to the supervision and management of the Keystone project, it was stated that Morgan executed the bond application and indemnity agreement in favor of Guaranty Company at the special instance and request of R.W. Hyde, Jr. Morgan was asked on cross-examination, if the conference with Bates was responsible for his executing the indemnity agreements, why he said in the above instrument that he did so at the special instance of Hyde. He replied, "I can't answer that." The chancellor was amply justified in determining from the evidence that Bates did not make the statement attributed to him by Morgan, and that such statements as Bates did make were true, and had nothing to do with Morgan entering into the arrangement with Hyde.
Morgan also contends that the chancellor's opinion indicates that he was under the impression that Morgan was required to prove that Bates was solely responsible for his subsequent dealings with Hyde. As we understand the chancellor's opinion, what he said was that Morgan would have him believe that Bates was solely responsible for the subsequent dealings with Hyde. As we understand Morgan's testimony, he did claim that it was as a result of his one conference with Bates on March 19, 1958, that he entered into the arrangement with Hyde. He emphatically denied that he ever had any discussion with Hyde or anyone else relative to an arrangement with Hyde to assist him in securing bond credit prior to this date. He said he never had any further discussion with Bates about the matter after this day. He stated that he placed full reliance on the statements that he said Bates made, and if Bates had not made them, he would not have entered into the business arrangement with Hyde. Thus it did appear from his testimony that he would have the court believe that these alleged statements of Bates were the sole reason for his entering the business arrangement with Hyde. The proof in contradiction of Morgan's testimony is so overwhelming that the chancellor evidently simply refused to accept any of his testimony. When the chancellor's opinion is read as a whole, we think it reflects that he clearly understood the issues, the testimony, and the law involved.
The chancellor resolved the factual issues on the question of fraud in law against Morgan and in favor of Guaranty Company. His findings are amply supported by the evidence, and we are not warranted in disturbing them. The citation of authorities to this effect is wholly unnecessary.
*923 It is also urged by Morgan that there was no consideration for the asserted liability for the reason that the bond applications which contained the indemnity agreements were executed after the respective bonds were issued. We find no merit in this contention. The chancellor found that at the time the bonds for the bid jobs were issued, Morgan and Hyde were actual partners as to these jobs. This finding is supported by the evidence. In fact, it is not seriously argued that the facts do not support this finding of the chancellor. The facts are for the most part the same as those set out in our opinion, Morgan v. Jackson Ready-Mix Concrete, 247 Miss. 863, 157 So.2d 772 (1963), wherein we held that the facts were sufficient to support the finding of the jury that a partnership existed between Morgan and Hyde. Morgan insists that if there was a partnership, it was brought about by the fraud in law practiced by Guaranty Company. This issue has been resolved against Morgan, and no further discussion of it is necessary.
Morgan executed the indemnity agreements in the negotiated jobs as indemnitor. He did this under an agreement with Hyde that he would receive a commission of two and one-half per cent of the contract price for acting as indemnitor or guarantor. The proof shows that he actually received this consideration to the tune of many thousands of dollars. Thus Morgan received a benefit for signing the indemnity agreements. It is not necessary that the consideration move from the indemnitee to the indemnitor, but it is necessary only that there be a valid consideration to support the agreement. Furthermore, the proof in this case shows that there was an agreement between Bates, acting for Guaranty Company, and Morgan, that Morgan would execute all bond applications on jobs in which Morgan and Hyde were interested. It is a general rule that a guaranty of a preexisting debt or obligation of another is not binding on the guarantor without a new and independent consideration to support it. However, an exception to this rule is when the guaranty is connected with, and the inducement to the original credit or obligation, or a result of a previous promise by the guarantor upon the faith of which the credit was obtained, it requires no new or independent consideration, but is a part of the original transaction and the consideration upon which the credit was given. Standley v. Miles & Adams, 36 Miss. 434 (1958). The antecedent promise of Morgan was the inducement to Guaranty Company to make the payment and performance bonds on the negotiated jobs, and was part of the consideration upon which the bonds were executed.
The only other assignment of error that we deem it necessary to notice is the assignment that the chancellor was in error in allowing Guaranty Company attorney's fees to pay its attorney for bringing this suit to enforce the indemnity contract. This question must be determined from the language of the indemnity agreement. Unless the indemnity agreement authorizes recovery of such fees, the court was without power to allow them. The pertinent part of the agreement is in the following language:
SECOND, to indemnify the Company against all loss, damages, claims, suits, costs and expenses whatever, including court costs and counsel fees at law or in equity, or liability therefor, which the Company may sustain or incur by reason of: executing or procuring said bond, or procuring its release or evidence thereof from same, or investigating, defending, prosecuting or settling any claim, suit or other proceeding which may be brought or threatened by or against any of the undersigned or the Company in or allegedly in connection with said bond or any collateral security hereunder or any of the agreements herein contained; and to place the Company in funds before it shall be required to make any payment; * * *. (Emphasis added.)
Morgan cites and relies upon United States Fidelity and Guaranty Company v. Falk, 214 Minn. 138, 7 N.W.2d 398 (1943), *924 wherein this precise question was before the Court. The Court held that United States Fidelity and Guaranty Company could not recover counsel fees, and said:
Here the agreement provides for indemnification for counsel fees "by reason or in consequence of its having executed said bond." Nothing is said as to attorneys' fees to enforce the indemnity contract. Clearly, we think, only actions on the bond brought under its provisions were contemplated. 7 N.W.2d at 401.
However, the indemnity agreement in Falk reads as follows:
To indemnify and save the Company harmless from any and all loss, costs, charges, suits, damages, counsel fees and expenses of whatever kind or nature, which it shall or may, for any cause, at any time, sustain or incur, or be put to, by reason or in consequence of its having executed said bond. (Emphasis added.) 7 N.W.2d at 399.
It is apparent that there is a marked difference between the indemnity clause in Falk and the one involved in this case. It will be noted that the agreement here not only covers counsel fees which Guaranty Company may incur as a result of suits in connection with the bond, but covers also counsel fees that it may incur by reason of its prosecuting a suit in connection with any agreement herein contained, meaning in this case that any suit it was necessary for Guaranty Company to bring to enforce the indemnity agreements Morgan executed.
We think the foregoing clause is clear and unambiguous, and that the chancellor correctly construed it to mean that Guaranty Company was entitled to recover reasonable attorney's fees incurred to enforce the indemnity agreement.
Guaranty Company filed a motion for allowance of attorney's fees for services in connection with this appeal. Inasmuch as we find no merit in the appeal, the motion is well taken, and should be sustained. It is our opinion that allowance of an additional fee in the amount of $25,000 is reasonable for such services, and the fee will be fixed for this amount. T.M. Strider & Co. v. Western Cas. & Sur. Co., 10 So.2d 350 (Miss. 1942).
Affirmed.
ETHRIDGE, C.J., and RODGERS, JONES and BRADY, JJ., concur.