ROBERTSON, Justice.
This is an appeal by Gerard A. Harrison, Harrison Ranch, Inc. and Cattle Coaches, Inc., from a decree of the Chancery Court of Washington County awarding a money judgment against them in favor of Douglas C. Wynn in the total sum of $81,972.86.
Harrison Ranch Inc. and Cattle Coaches Inc. are corporate entities principally or wholly owned by Gerard A. Harrison.
Harrison (this reference will include all appellants) was a man having substantial business interests in several states, including, among others, the large scale commercial raising of catfish. He owned considerable quantities of land in both Arkansas and Mississippi, his Mississippi land lying in Washington, Tallahatchie and Hum-phreys Counties. Wynn is a lawyer, engaged in the general practice of law in Greenville, to some extent specializing in the fields of transportation and admiralty.
Wynn had represented Harrison in several matters, not connected with the situation out of which the present litigation arose. The association between Harrison and Wynn continued intermittently from its beginning sometime in 1964 into 1968.
On December 30-31 of 1968, Harrison and Wynn entered into an agreement involving the conveyance by Harrison to Wynn of 1200 acres of land in Humphreys County. This transaction was evidenced by five written documents. These were:
(1) The contract of sale;
(2) The warranty deed executed by Harrison conveying the land to Wynn;
(3) The promissory note for $248,200 executed by Wynn payable to Harrison for (part of) the purchase price;
(4) Purchase money deed of trust on the subject land securing the note executed by Wynn; and
(5) The so-called “buy-back” agreement executed by both Harrison and Wynn.
There was a lengthy trial and a great deal of testimony on both sides.
The controversy, in the main, however, turns upon obligations claimed by Wynn to have been assumed by Harrison under the “buy-back” agreement. The chancellor stated it thus:
It is immmediately seen that Wynn can prevail only on the validity of the “Buy-Back Agreement” and Harrison can prevail only on the invalidity thereof.
The “buy-back” agreement (in part) was as follows:
[I]t is hereby covenanted and agreed by and between Harrison and Wynn that, at any time for a period of three years from and after the date hereof, on written demand made by Wynn to Harrison, Harrison will purchase or cause to be purchased from Wynn the above lands, at the same price paid by Wynn therefor, plus any interest, taxes or other payments made or paid by Wynn, and, in the event of such payment, Wynn shall deliver a warranty deed to Harrison, or his assigns, conveying said property free and clear of all liens except the *270 above stated or any replacements thereof. It is the intent of the parties that Wynn shall be indemnified in full for any costs, expenses, etc. incurred by him in the ownership of said property, should he elect to reconvey said property to Harrison under this Agreement.
Harrison testified that he did not remember ever having signed the “buy-back” agreement and said that he had known nothing of its existence until it was brought to his attention by Wynn more than two years later when Wynn called upon him to “buy back” the land under its terms. It is not disputed, however, that the agreement does, in fact, bear Harrison’s signature and this was not denied by Harrison under oath in his pleadings as required by statute' nor did Harrison deny it when he testified at the trial. As to whether Harrison knowingly signed this agreement and understood it, the testimony of Harrison and Wynn is directly and irreconcilably conflicting. The chancellor found this issue against Harrison.
There is testimony to the effect that Harrison hurried the closing of the deal in order to complete it “before the end of the year” so that he might obtain some tax advantage. In any event, when the documents had been executed, Harrison hypoth-ecated Wynn’s note to his bank in Texas, and when Wynn failed to pay, the legal department of the bank sought to collect the note from Wynn. Wynn failed or declined to pay the note and called on Harrison to buy the land back and to reimburse him as provided in the “buy-back” agreement.
The note not having been paid, the bank foreclosed. Suit was then brought by the bank against both Harrison and Wynn for the deficiency. Harrison and Wynn settled that suit with the bank, but reserved their rights against each other. Wynn, having called upon Harrison within three years to fulfill his obligations under the “buy-back” agreement and buy the land back and Harrison having declined to do so, the present litigation between Wynn and Harrison ensued.
Harrison urges that, since his relationship with Wynn in several matters had been that of attorney and client, their relationship was fiduciary in character and gave rise to a presumption of overreaching or undue influence on Wynn’s part and rendered the agreement invalid. If it should be assumed that such a presumption arose, both Harrison and Wynn testified at length and in great detail concerning every facet of the transaction between them and each gave a different account of the material facts. In so doing, the facts and circumstances were fully developed and disclosed by the testimony of the contending parties, both of whom were, of course, alive and under no disability. The decision thus became one for the chancellor as trier of facts, upon the conflicting evidence, not upon the presumption alone.
The chancellor accepted Wynn’s version of the facts and rejected Harrison’s, finding from the evidence that Harrison had not been overreached or overper-suaded by Wynn in executing the several documents, including the “buy-back” agreement.
The evidence justifies the conclusion that Harrison initiated the deal, that the proposition was made by Harrison to Wynn, that Harrison fixed the price and terms and it by no means appears that the price agreed to was inadequate. We are unable to say that the chancellor’s decision on the facts in the record is manifestly wrong.
In 7 C.J.S. Attorney And Client § 127 b.(1), (1937) it is said:
Notwithstanding the absolute manner in which the general rule that all transactions or dealings between attorney and client are presumptively fraudulent and invalid is often stated, it is mainly a rule of equity or public policy which is not *271 inflexible, but may be relaxed or varied in its application according to the circumstances. Moreover, it is founded on the theory that confidence or influence was reposed in the attorney, and abused to the injury of the client or the advantage of the attorney, so that the mere relationship of attorney and client is not sufficient to invalidate a transaction without the appearance of these facts, or such circumstances as will permit a deduction or assumption that they existed, and if the circumstances are such as to preclude an assumption or presumption that confidence was reposed and that undue influence was exercised with respect to the matter involved the general rule does not apply.
In light of the foregoing, it may be said that the validity of a dealing between an attorney and client in a particular case is dependent to a certain extent on its own circumstances, the equities of the' parties, and the possibilities that the attorney had to exercise influence or fraud . . . . [I]t is frequently recognized that the beneficent protection of the general rule is not always needed as some clients may be shrewder or better positioned than some attorneys in business deals; and if the case is one in which the attorney possesses no particular knowledge or influence by reason of his position or training, and the client is an intelligent and experienced businessman who is as well or better informed than the attorney with reference to the material facts and likely to exercise his own independent judgments, the transaction will often be sustained unless a breach of faith or unfair dealing on the part of the attorney is clearly shown. In other words, if the parties are sui juris and deal with each other on terms of equality as between men competent to make their own contracts, the law does not deny to the attorney a right to the fruits of open dealings with his client in business matters in which the client is amply able to protect himself, at least where a breach of faith or unfair dealing on the part ’ of the attorney is not clearly shown.
It is also suggested on the part of Harrison that the parties were in pari delicto, that the transaction was a sham, designed to mislead or defraud Harrison’s bank or some third party or parties in relation to the subject matter. If this had been established to the satisfaction of the chancellor it would not have been sufficient alone to invalidate, the agreement as between Harrison and Wynn or have had the effect of releasing either from his obligations to the other. It is pointed out that the subject matter of the agreement is neither malum in se or malum prohibitum. Although it does now appear, in the light of the after-developed circumstances, that Harrison seems to have acted improvidently in executing the “buy-back” agreement, this does not relieve him from the obligations which he assumed. Both Wynn and Harrison were shown to have had more than ordinary experience in dealing in land and in handling land transactions. The controlling issues in the case were factual and were peculiarly for the determination of the chancellor.
In Morgan v. United States Fidelity & Guaranty Co., 191 So.2d 917 (Miss.1966), the Court said:
Inasmuch as the chancellor determined the factual issues in favor of Guaranty Company, we must consider the evidence in the light most favorable to Guaranty Company.

The chancellor resolved the factual issues on the question of fraud in law [as well as in fact] against Morgan and in favor of Guaranty Company. His findings are amply supported by the evidence, and we are not warranted in disturbing them. The citation of authorities to this effect is wholly unnecessary. (191 So.2d at 918, 922).
*272 The provisions of the “buy-back” agreement obligating Harrison to reimburse Wynn are quite broad and are sufficiently so to cover Wynn’s expenditures and expenses, including attorneys’ fees.
The decree appealed from will, therefore, be affirmed.
Affirmed.
GILLESPIE, C. J., PATTERSON and INZER, P. JJ., and SMITH, SUGG, WALKER and BROOM, JJ., concur.