361 So.2d 481 (1978)
FIRST AMERICAN NATIONAL BANK OF IUKA, Mississippi
v.
ALCORN, INC., et al.
No. 50162.
Supreme Court of Mississippi.
July 12, 1978.
Rehearing Denied August 9, 1978.
*484 Wynn & Bogen, Douglas C. Wynn, Greenville, for appellant.
Price & Krohn, James E. Price, Sharp & Fisher, Jimmy B. Fisher, Smith, Downs, Ross, Trapp & Coleman, Donald Ray Downs, Corinth, Mitchell, McNutt, Bush, Lagrone & Sams, Guy Mitchell, Jr., Tupelo, for appellees.
Before PATTERSON, BROOM and BOWLING, JJ.
PATTERSON, Chief Justice, for the Court:
This is a complex case in which First American National Bank of Iuka, Mississippi, appeals from a decree of the Chancery Court of Alcorn County, naming as appellees Alcorn, Inc., Holiday Inns, Inc. (hereinafter Holiday), Westinghouse Credit Corporation (hereinafter Westinghouse), Sam Spain, Dr. James P. McLemore, Jr., and Homer C. Freeman. Alcorn, Inc., Spain and Freeman cross appeal.
Spain and McLemore, residents of Jackson, Tennessee, and Freeman of Alcorn County, Mississippi (hereinafter referred to as the Alcorn Group), entered a business venture to construct a Ramada Inn in Corinth, Mississippi. They organized a Mississippi corporation, Alcorn, Inc., to own and operate the inn. Alcorn, Inc., entered an agreement with Westinghouse for $775,000 to build the motel. This was a five-year short term construction financing contract in which Westinghouse acquired a first deed of trust of February 15, 1973, from this corporation on the motel site as well as a security interest in any after-acquired property.
In 1972 Spain on behalf of Alcorn, Inc., approached the bank for a $75,000 loan which was denied because it exceeded the bank's loan limits and was insufficiently secured. In April 1973, Clint Reed, a former resident of Jackson, Tennessee, employed by the bank in December, 1972, as vice-president and manager of the Corinth branch, loaned Spain, Freeman and McLemore $75,000 which was secured by a deed of trust on .33 acre of land adjacent to the construction site of Ramada Inn. At the time Vice-President Reed had authority to authorize secured loans not in excess of $25,000 and the bank's loan limit was $72,684. In May, 1973, the bank, pursuant to Reed's authorization, loaned Spain $25,000 secured only by a $12,500 certificate of deposit. The aggregate of these two loans, $100,000, was used to purchase certificates of deposit which were pledged to secure Westinghouse in its construction loan.
In December, 1973, Alcorn, Inc., entered into an agreement with Inn Keepers Supply Company, a division of Holiday, for the purchase of furniture, furnishings and equipment for the motel at a cost of $97,635.69. A deposit of $1,000 was paid, leaving a balance of $24,158.93 due before the date of shipment, and it was agreed that a commitment letter would be obtained from the bank for the remaining $72,476.76. Although Spain had been negotiating with the bank for another loan, apparently unsuccessfully, to pay for the furniture and furnishings, nevertheless, without prior bank approval, Reed wrote a letter to Holiday on January 3, 1974, signed by one of his subordinates, B.E. Tidwell, Vice-president of the Corinth branch, in which the bank agreed to pay $72,476.76 after the purchaser had approved *485 the invoice and presented it to the bank for payment.
In the spring of 1974, McLemore and Spain purchased certificates of deposit to secure the proposed loan of $90,000 ostensibly to cover the purchase of furniture and equipment with overruns. According to Spain, Reed had agreed the loan would be made so that the letter of credit could be paid. Spain also testified that he had several conferences with Tidwell regarding the proposed loan in May or June of 1974.
The notes of Spain, Freeman and McLemore for $100,000 were not paid when they became due in 1974. In June after Reed left the bank's employment, Spain's note was renewed and the Alcorn Group's $75,000 note was divided into two separate notes, bringing it within loan limits as well as permitting a finance charge. A note for $25,603.50 was executed by McLemore, Spain and Freeman and a note for $52,270 was executed by Alcorn, Inc., being signed by the same individuals in their corporate capacities.
For these loans the bank required greater security and Spain, McLemore and Freeman conveyed the .33 acre, security for the original loan of $75,000, to Alcorn, Inc., which in turn executed a deed of trust on it to secure the $52,270 loan. As additional security the Alcorn Group, together with Mary H. McLemore, wife of Dr. McLemore, and Inez H. Freeman, wife of Homer Freeman, executed an unlimited guaranty agreement wherein each jointly and severally guaranteed all previous indebtednesses to the bank.
The bank did not learn of the letter of credit to Holiday until June 1974 nor receive a copy of it until July 12, 1974, when it refused to acknowledge any obligation under it. After the bank refused to pay Holiday, Claude L. Stiner, contract collection manager for Holiday, agreed to a ninety-day extension of the indebtedness with Alcorn, Inc., for it to secure finances to pay for the merchandise. Holiday agreed on the condition that (1) the bank agree to the extension and furnish Holiday a supplemental letter to that effect, (2) that the members of the Alcorn Group individually execute a promissory note for the full amount due, including overages and interest, and (3) that Alcorn, Inc., give Holiday a security interest in the merchandise. Although the bank agreed to grant such letter, it never did so. However, the Alcorn Group, in their corporate and personal capacities, executed a promissory note to Holiday in the principal amount of $83,970.25. Additionally, Alcorn, Inc., executed a conditional sales contract and Spain executed a financing statement.
Dr. Kelly S. Segars, President of the bank, testified that he had no knowledge of the letter of credit or the $90,000 loan commitment until after Reed departed the bank in May or June of 1974, nor were either discussed at any bank board meetings through June, 1974. J.R. Long, Chairman of the Board and Executive Vice-President of the bank, testified he was not aware of the letter of credit until after July 12, 1974, and that the $90,000 loan commitment was not approved by the directors or the loan committee, and moreover, was never discussed with him by Reed.
Holiday completed its delivery of furniture and furnishings and presented its invoice of $80,354.31, then due, representing the amount of the bank's letter, the overages resulting from change orders and credit for merchandise which had been returned. The invoice was approved by Spain for Alcorn, Inc., and payment was requested of the bank in accord with its letter of January 3, 1974, but payment was refused. In December, 1974, Holiday sued the bank, Spain, McLemore and Freeman in the Circuit Court of Alcorn County to collect under the letter. The suit was transferred to the Chancery Court of Alcorn County and consolidated with another suit between the bank, Alcorn, Inc., Spain, the Freemans, the McLemores, and Westinghouse. Ultimately, the bank became the complainant and the remaining parties became the defendants.
The bank's bill of complaint was against Alcorn, Inc., Spain, the McLemores and the Freemans to recover on the notes and for *486 damages resulting from an alleged conspiracy with Reed; against Holiday to declare the letter of credit unenforceable and in the alternative, if judgment was adverse to the bank, to stay execution until Holiday had made resort to the securities of Alcorn, Inc., Spain, McLemore and Freeman under the doctrine of "marshaling of assets"; and, in the further alternative, against Alcorn, Inc., and Westinghouse on the theory that if it must pay Holiday, then the bank should have a judgment against Alcorn, Inc., with a lien upon the furniture and furnishings with priority over Westinghouse.
Holiday filed a cross bill against the bank for the amount of the letter of credit and against Alcorn, Inc., Spain, McLemore and Freeman to recover the sum of $83,970.25, the amount of the note executed by them on July 5, 1974, plus interest. Alcorn, Inc., filed a cross bill against the bank for breach of contract in failing to honor its loan agreement and failure to pay Holiday pursuant to the letter of credit as well as for damages for libel and slander. The Freemans and Spain filed separate cross bills against the bank for its alleged failure to honor its loan commitment and for damages for libel and slander.
After a vacation hearing, the chancellor dismissed the McLemores for lack of jurisdiction and the cause proceeded to trial with no judgment being taken against Inez H. Freeman. The chancellor's decree otherwise held:
1. Westinghouse had a first, prior and paramount lien on the real property, furniture, fixtures, equipment and other personal property described in its security instrument.
2. Holiday was permitted to recover $72,476.76 from the bank under the letter of credit, plus interest from March 13, 1974.
3. The bank was permitted recovery as follows:
(a) From Alcorn, Inc., $72,476.76, the amount of the letter of credit, plus interest from March 13, 1974.
(b) From Spain, $15,526.37, plus interest, the amount due on the May 3, 1973, note in the original amount of $25,000.
(c) From Alcorn, Inc., Spain and Freeman, jointly and severally, $67,721.16, plus interest, the amount due on the Alcorn, Inc., note of June 24, 1974, in the original principal of $52,270.
(d) From Spain and Freeman, jointly and severally, $32,398.88, plus interest, the amount due on the note of Spain, Freeman and McLemore executed on June 24, 1974, in the original sum of $25,603.50.
4. Holiday was granted recovery against Alcorn, Inc., Spain and Freeman, jointly and severally, for $83,970.25, plus interest on the promissory note of July 5, 1974, with any amount paid to Holiday by the bank in satisfaction of the judgment rendered on the letter of credit in Paragraph No. 2 above to be credited to the payment of this judgment.
5. The bank was authorized to foreclose on all deeds of trust and pledges of stock executed to it by Alcorn, Inc., Spain, McLemore and Freeman and to apply such proceeds to its judgment.
6. Other affirmative relief sought by the complainant or cross complainants was denied and dismissed with prejudice.
The assignments of error argued on appeal and cross appeal will be discussed separately.

I.
The appellant bank contends the chancellor erred in granting judgment for Holiday under the letter of January 3, 1974. The questioned letter was addressed to Inn Keepers Supply Company and signed by Bill Tidwell, vice-president, and reads in part as follows:
Our bank agrees to pay for the furnishings and equipment being purchased by Alcorn, Inc., from Inn Keepers Supply Company, a Division of Holiday Inns, Inc., in the amount of $72,476.76.
These funds will be disbursed to Inn Keepers Supply Company, a Division of Holiday Inns, Inc. upon presentation of the invoice covering the merchandise to *487 the purchaser who will approve for payment and present to our bank.
The bank argues this document is not a letter of credit because it is not a direct promise to pay, does not conspicuously state it is a letter of credit nor is it entitled such so as to accord with Mississippi Code Annotated section 75-5-102(1)(c) (1972), nor does it require a documentary draft as specified by Section 75-5-102(1)(a).
We think the writing constitutes a letter of credit. Section 75-5-103(1)(a), in part, provides:
"Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter ... [§ 75-5-102] that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit... .
It is true the document does not specifically state that it is a letter of credit, but such statement is not absolutely essential under Section 75-5-102(1), which provides:
(1) This chapter applies
(a) to a credit issued by a bank if the credit requires a documentary draft or a documentary demand for payment; and
(b) to a credit issued by a person other than a bank if the credit requires that the draft or demand for payment be accompanied by a document of title; and
(c) to a credit issued by a bank or other person if the credit is not within subparagraphs (a) or (b) but conspicuously states that it is a letter of credit or is conspicuously so entitled.
The bank issued the letter which by its terms requires the invoice, after purchaser approval, to be presented to the bank. The instrument clearly lies within the definition for documentary drafts under Mississippi Code Annotated section 75-5-103(1)(b) (1972) as follows:
A "documentary draft" or a "documentary demand for payment" is one honor of which is conditioned upon the presentation of a document or documents. "Document" means any paper including document of title, security, invoice, certificate, notice of default and the like. (Emphasis added.)
Further, Section 75-5-104(1) provides in part:
Except as otherwise provided in ... [§ 75-5-102(1)(c)] on scope, no particular form of phrasing is required for a credit. A credit must be in writing and signed by the issuer and a confirmation must be in writing and signed by the confirming bank... .
Thus, we conclude the document was a letter of credit.
The bank, however, additionally contends that since its files contain no such invoice, it is not obligated to pay. We are of the opinion there was sufficient evidence of the invoice to establish it even though the bank was unable to produce it. Tidwell testified that he received a copy of the approved invoice requesting payment and delivered it to Reed. Spain also testified that, as a purchaser, he approved the invoice and requested payment under the letter of credit, sending Reed an Alcorn, Inc., check in the amount of the credit preferring payment to be made by Alcorn, Inc., rather than with a check of the bank. Bank board chairman Long testified that Tidwell or Reed had received invoices from Holiday addressed to them as bank officials and stated that as far as the bank was concerned it had been requested to pay under the letter.
The bank next contends that by accepting the note of the Alcorn Group and the conditional sales contract from Alcorn, Inc., Holiday is estopped from seeking relief against it under the letter of credit, or stated differently, that Holiday is estopped because there was a novation of the contract.
A novation involving substitution of debtors is a contract that discharges at once an existing obligation and creates a new contractual obligation by including as the new obligor a party who was not previously obligated. Mississippi Motor Finance, Inc. v. Enis, 254 Miss. 625, 181 So.2d 903 (1966). The rule is also established that the release of one debtor and the substitution of another may be implied from the circumstances *488 absent an express substitution. American Blakeslee Mfg. Co. v. Martin & Son, 128 Miss. 302, 91 So. 6 (1922). However, this requires substantial proof that the creditor impliedly accepted the new debtor in the place of the old and it must not appear that the creditor intended to hold both new and old debtor for the obligation. This determination is factual and necessary to an implied novation and release of the old debtor. American Blakeslee, supra.
The record discloses no express novation and we are of the opinion there are no facts relating to the conduct of the parties so as to give rise to an implied novation. In fact, Claude Stiner testified that Tidwell agreed to extend the bank's obligation under a supplemental letter for a ninety-day extension and if Alcorn, Inc., had not paid in full prior to October 9, then the bank would make payment. It is true the bank repudiated such extension after Tidwell left its employment, but we think this testimony, with other evidence, clearly shows there was no intention for the bank to be released. Consequently, Holiday was not estopped in its pursuit of payment by the letter of credit.
Finally, the appellant argues that the credit is unenforceable because it constitutes an agreement to make advances in excess of its legal loan limit under 12 U.S.C.A. section 84 (1972). On January 2, 1974, the bank's loan limit was $63,778 and by February 1, 1974, it was $55,965.
Section 84 of 12 U.S.C.A. (1972) provides in part as follows:
The total obligations to any national banking association or any person, copartnership, association, or corporation shall at no time exceed 10 per centum of the amount of the capital stock of such association actually paid in and unimpaired and 10 per centum of its unimpaired surplus fund. The term "obligations" shall mean the direct liability of the maker or acceptor of paper discounted with or sold to such association and the liability of the indorser, drawer, or guarantor who obtains a loan from or discounts paper with or sells paper under his guaranty to such association and shall include in the case of obligations of a copartnership or association the obligations of the several members thereof and shall include in the case of obligations of a corporation all obligations of all subsidiaries thereof... .
Assuming section 84 above has application and that the obligation of the bank under the credit was a loan, we nevertheless are of the opinion the validity of the letter of credit is unimpaired even if in excess of loan limits. We are persuaded to this conclusion because the comptroller of currency subjects standby letters of credit, with narrow exception to the bank-lending limits as stated in 12 CFR (Code of Federal Regulations) section 7.1160 (1977), as follows:
§ 7.1160 Application of lending limits to standby letters of credit.
(a) Definition. A "standby letter of credit" is any letter or credit, or similar arrangement however named or described, which represents an obligation to the beneficiary on the part of the issuer (1) to repay money borrowed by or advanced to or for the account of the account party or (2) to make payment on account of any indebtedness undertaken by the account party, or (3) to make payment on account of any default by the account party in the performance of an obligation.[1]
[1] As defined in this subsection (a), the term "standby letter of credit" does not include commercial letters of credit and similar instruments where the issuing bank expects the beneficiary to draw upon the issuer, which do not "guaranty" payment of a money obligation and which do not provide for payment in the event of default by the account party.
(b) Subject to lending limits. A standby letter of credit is subject to the limitations of section 84 and must be combined with any other nonexcepted loans to the account party by the issuing bank for the purposes of applying section 84.
(c) Exceptions. All standby letters of credit shall be subject to the provisions of this paragraph except where:
(1) Prior to or at the time of issuance, the issuing bank is paid an amount equal to the bank's maximum liability under the standby letter of credit; or

*489 (2) Prior to or at the time of issuance, the issuing bank has set aside sufficient funds in a segregated deposit account, clearly earmarked for that purpose, to cover the bank's maximum liability under the standby letter of credit; or
(3) The Comptroller of the Currency has found that a particular standby letter of credit or class of standby letters of credit will not expose the issuer to the similar risk of loss as would a loan to the account party.
The letter of credit in question was to make payment on account of an indebtedness undertaken by Alcorn, Inc., the account party, and does not come within any of the above exceptions. See also 12 CFR § 337.2 (1977).
Having assumed but not decided this instrument is controlled by the statutory loan limit, we need ascertain its validity as an enforceable agreement.
A loan by a national bank in excess of the restriction is not void as to the borrower but subjects the bank and its officers to penalties upon action by the government. Cooper v. Mercantile Nat'l Bank, 137 Ga. App. 605, 224 S.E.2d 442 (1976). It has been held, absent knowledge of a bank's loan limit, a borrower is entitled to hold a bank liable for breach of contract to make a loan even though the bank would exceed its limit in doing so. This is so because the purpose of the loan limit statute is for regulation of banking institutions and their officers rather than for frustrating well-intentioned unwary borrowers. Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston, 526 S.W.2d 407 (Mo. App. 1975). Further, contractual obligations exceeding the authority granted or limited by statute when not declared invalid by the lawmakers have often been enforced. Muller v. Harms, 117 Neb. 657, 221 N.W. 898 (1928), and the authorities cited therein. It is noted that 12 U.S.C.A. § 84, as well as Mississippi Code Annotated section 81-5-77 (1972) does not declare such a loan to be invalid although penalties are provided for an officer engaged in such practice.
Although most courts hold such statutes do not make contracts which are violative thereof, void or even unenforceable, nearly all of the decided cases have involved actions against borrowers who seek to avoid the liability thereby. Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston, 526 S.W.2d 407 (Mo. App. 1975). In Bank of College View v. Nelson, 106 Neb. 129, 183 N.W. 100 (1921), it was held that as a general rule courts will not refuse to enforce a bank's contract for a loan in excess of lending limits. That Court said:
In limiting the amount of an individual loan ... the statute established a rule for the government of the bank... . The penalty for violating the act applies to "any officer, director, or employee" of the bank. An excessive loan does not subject the borrower to a penalty. He does not stand before the statute in the same light as the offending banker. The penalty is a matter between the state and the lender. The general rule is that an excessive borrower cannot prevent the collection of his debt by pleading and proving a violation of the statute.... Where the law permits a bank to enforce a contract for an excessive loan, it should not be permitted to escape liability for the damages resulting from its failure to fully perform such a contract. For these and other reasons, the great weight of modern authority supports the doctrine that courts will not refuse to enforce a bank's contract for the loan of money, or disallow damages for breach thereof ... notwithstanding a statute penalizing the banker for exceeding that limit... .
(106 Neb. at 130-131, 183 N.W. at 101)
The bank cites three cases which hold agreements in violation of loan limit statutes to be void. However, they involve agreements between banks or between a bank and an employee so that the parties could be presumed to know the loan limits. See Dove Creek State Bank v. Lawrence Warehouse Co., 157 Colo. 263, 402 P.2d 369 (1965); Jaynes v. First National Bank of Ketchikan, 236 F.2d 258, 16 Alaska 388 (9th Cir.1956); and Oakes National Bank v. *490 Farmers' State Bank, 52 N.D. 49, 201 N.W. 696 (1924). In Oakes, supra, it was held the evidence did not support an innocently entered contractual arrangement for borrowing or lending but rather a purposeful arrangement to violate statutes against excess loans and in such case the law would not give a guilty party assistance in enforcing such a contract.
Presently, we do not think the loan limits were common knowledge so that Holiday would have notice the amount of the letter of credit was in violation of banking statutes. The record discloses no reason for Holiday to doubt the bank's promise or any design by Holiday to violate banking laws. Moreover, there was no reason for Holiday to inquire into the security offered by the Alcorn Group in issuance of the credit. Under Mississippi Code Annotated section 75-5-105 (1972) it is stated that no consideration is necessary to establish a credit or to enlarge or otherwise modify its terms. Comment to Section 5-105 of the Uniform Commercial Code (1972) provides as follows:
It is not to be expected that a financial institution will engage its credit without some form of expected remuneration. But it is not expected that the beneficiary will know what the issuer's remuneration was, or whether in fact there was any identifiable remuneration in a given case. And it would be extraordinarily difficult for the beneficiary to prove the issuer's remuneration. This section dispenses with such proof.
We think, as did the trial court, that the bank is liable to Holiday under the letter of credit and, therefore, wrongfully dishonored it.

II.
The appellant contends the chancellor erred in awarding Holiday interest from March 13, 1974, on the amount due under the letter of credit. It provided that funds would be disbursed upon presentation of the invoice approved by the purchaser. Although the invoice was dated March 13, 1974, it had not been approved by Spain on behalf of Alcorn, Inc., until sometime after April 16 and on or before May 3. Spain testified that on April 16 a representative of Inn Keepers Supply inquired about payment, but he requested more time in order to inspect the merchandise. On May 3, when the representative called back to determine its status, Spain informed him that he had approved the shipment and instructed the bank to pay. Under the contract between Inn Keepers and Alcorn, Inc., payment was due within sixty days after the requested shipping date which we determine to be February 1, 1974, or seven days after the inn opened to the public on March 17, 1974, whichever date occurred first. However, the bank's obligation began, in our opinion, at the time the approved invoice was presented. This occurred between April 16 and May 3. Therefore, we are of the opinion the chancellor erred in establishing the default on March 13 rather than May 3, 1974.

III.
Appellant next assigns as error that the chancellor erred in finding Westinghouse's lien on the merchandise sold to Alcorn, Inc., by Holiday was paramount to the bank's right, in not establishing it as an equitable lien superior to Westinghouse's lien, and in refusing to apply the doctrine of marshaling of assets. It further submits that if Holiday's judgment is affirmed on the letter of credit, then this Court should find that the bank was entitled to equitable subrogation of Holiday's lien on the merchandise to the extent of the amount of the letter with priority over the general lien of Westinghouse and that it be permitted to foreclose such equitable prior lien. Otherwise, the bank submits that the only security it will have is a first deed of trust on one-third acre of land.
The record discloses that when Westinghouse advanced $775,000 to Alcorn, Inc., in addition to taking a first deed of trust on the real estate, it obtained a security agreement as to after-acquired property as follows:

*491 All present and future rents, issues and profits and all present and future items of furniture, furnishings, supplies, appliances, and equipment used in, on, or in the operation of the premises known as Ramada Inn, located on the Northeast corner of Galyean Road, and U.S. Highway 72, Corinth, Alcorn County, Mississippi. Debtor may not sell, assign, lease, transfer, or otherwise dispose of without secured party's prior written consent.
It was after this agreement that Alcorn, Inc., entered into an agreement with Holiday for the purchase of furniture, furnishings and equipment.
Appellant argues that as the items purchased from Westinghouse constituted equipment as defined in Mississippi Code Annotated section 75-9-109(2) (1972), that a security interest would have to be perfected under Section 75-9-401(1)(c) by filing financing statements in the Chancery Clerk's office of Alcorn County and in the office of the Secretary of State. It is undisputed that such a statement was filed in Alcorn County but the bank contends no such statement was filed in the Secretary of State's office and therefore Westinghouse has no security interest in the personalty. Westinghouse contends that such statement was filed with the Secretary of State and that the document was examined at trial though not made an exhibit. The chancellor found that such a financing statement had been recorded.
Additionally, the sworn answers of Alcorn, Inc., the Freemans, and Spain alleged the bank was given actual and constructive notice of the Westinghouse agreement and knew that Westinghouse had a valid first lien against the equipment purchased from Holiday. Spain testified that during his negotiations the bank was aware that Westinghouse had a first lien on the real property and on the chattels connected with it. Mississippi Code Annotated section 75-9-401(2) (1972) provides as follows:
(2) Except as [otherwise] provided ... a filing which is made in good faith in an improper place or not in all of the places required by this section is nevertheless effective with regard to any collateral as to which the filing complied with requirements of this chapter and is also effective with regard to collateral covered by the financing statement against any person who has knowledge of the contents of such financing statement.
The record is not conclusive, although it is persuasive, that a financing statement was filed with the Secretary of State and since the bank had knowledge of Westinghouse's interest, we think that Westinghouse properly secured its interest in the after-acquired personalty.
Appellant also argues that Westinghouse failed to give value as required under Section 75-9-204 so that the security interest did not attach. We think this contention is without merit because Westinghouse did give value by advancing the money to Alcorn, Inc., for the project.
Another contention of appellant is that it should be given preference in the collateral under a purchase money security interest. This theory is controlled by Section 75-9-312(4) which provides:
(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten (10) days thereafter.
The record fails to disclose that Holiday or the bank perfected a purchase money security interest within ten days in accord with the statute. To the contrary, Holiday stipulated it did not claim a purchase money lien superior to the Westinghouse lien. Tidwell and Long confirmed that no purchase money security interest had been obtained by the bank. Appellant claims, however, that Holiday owed it a duty to perfect an interest on its behalf when it advanced sums under the letter of credit. It must be observed the bank drafted the letter of credit and had the opportunity to make it conditional upon Holiday's obtaining such a security interest and did not do so. We *492 conclude Holiday was under no obligation in this regard.
Therefore, in sum, we are of the opinion that Westinghouse had a prior and paramount lien on the real property and after-acquired property and that the bank is not entitled to equitable subrogation.
As an alternative, appellant urges that the doctrine of marshaling of assets has application. This doctrine has been defined as where a creditor has a lien on two funds in the hands of the same debtor and another creditor has a lien on only one of them, that equity on the application of the latter will compel the former to make his debt out of that fund to which the latter cannot resort. Dilworth v. Federal Reserve Bank of St. Louis, 170 Miss. 373, 150 So. 821 (1933). However, the bank does not have the right to invoke this doctrine because it is not a creditor with a lien on any of the funds. Therefore, we think the chancellor was correct in his refusal to marshal the assets involved.

IV.
Another contention of appellant is that the chancellor erred in finding the unlimited guaranty agreement of June 25, 1974, invalid. It argues that the agreement was supported by valuable consideration. Those signing the agreement jointly and severally guaranteed payment to the bank of any and all indebtednesses that might then or thereafter become due from Alcorn, Inc., Spain, McLemore and Freeman. The bank sought judgment against Alcorn, Inc., Spain, the McLemores and the Freemans, jointly and severally, on all notes due which had been signed by Alcorn, Inc., or any of the Alcorn Group. The lower court found the bank entitled to judgment on the notes but only against those who signed them, failing to find the liability to be joint and several under the unlimited guaranty agreement.
The purpose of dividing the original $75,000 Alcorn Group note into two lesser ones was to facilitate the sale of part of the indebtedness and to bring the bank within its loan limits. We do not think the guaranty agreement comes within an exception as stated in Morgan v. United States Fidelity & Guaranty Company, 191 So.2d 917 (Miss. 1966), as follows:
... It is a general rule that a guaranty of a preexisting debt or obligation of another is not binding on the guarantor without a new and independent consideration to support it. However, an exception to this rule is when the guaranty is connected with, and the inducement to the original credit or obligation, or a result of a previous promise by the guarantor upon the faith of which the credit was obtained, it requires no new or independent consideration, but is a part of the original transaction and the consideration upon which credit was given... . (191 So.2d at 923)
Although appellant contends that its forbearance to sue on the past due (original) $75,000 note was sufficient consideration for the guaranty, the mere fact of forbearance without a promise to forbear or a request to forbear is not sufficient consideration. Dedeaux v. Young, 251 Miss. 604, 170 So.2d 561 (1965); Owen Tie Co. v. Bank of Woodland, 136 Miss. 114, 101 So. 292 (1924). As the record reveals no agreement to forbear, we are of the opinion that the unlimited guaranty agreement was invalid as held by the trial court.

V.
Another assignment of error by appellant is that the chancellor erred in sustaining McLemore's motion to dismiss for lack of jurisdiction. However, before reaching this issue, we must decide if this Court has jurisdiction to entertain the bank's appeal against McLemore as it has previously appealed on the same issue.
After McLemore was dismissed on his motion for lack of jurisdiction, the bank was granted an interlocutory appeal on order of the trial court and perfected its appeal to this Court. When seven days after the return day to this Court had passed and appellant had made no effort to prosecute the appeal, appellee McLemore filed a motion to docket and dismiss which *493 we sustained. A rehearing on that action was denied en banc on November 23, 1976. The trial in the lower court proceeded and a final decree was entered on February 13, 1976. After entry of the decree, the bank again appealed to this Court raising McLemore's jurisdictional question. Once more McLemore filed a motion to dismiss which was passed to the hearing of the appeal on its merits.
Interlocutory appeals are allowable from chancery courts where the court has sustained a motion dismissing a party for lack of jurisdiction. Mississippi Code Annotated section 11-51-7 (1972) provides in part as follows:
An appeal may in sound discretion be granted by the chancellor in term time, or in vacation, from any interlocutory order or decree ... or when having sustained or overruled a demurrer or motion he may think an appeal proper in order to settle all the controlling principles involved in the cause... .
Therefore, we think that this Court has jurisdiction of the interlocutory appeal. And, indeed, the bank does not allege it was without fault in not proceeding with the first appeal but rather states that it abandoned it. However, Mississippi Code Annotated section 11-3-15 (1972) provides as follows:
After the dismissal of an appeal or supersedeas by the supreme court, another appeal or supersedeas shall not be granted in the same cause, so as to bring it again before the court.
This statute has a long history in our jurisprudence and was our law as early as 1822 when its language was "that after the dismission of an appeal, writ of error or supersedeas in the Supreme Court, no appeal, writ of error or supersedeas shall be allowed." Revised Code of 1823, § 33, p. 156.
This section has been interpreted to the effect that the statute does not apply where the dismissal is without fault of the appealing party or from an irregularity over which he has no control. Stokes v. Shannon, 55 Miss. 583 (1878); Bull v. Harrell, 7 How. 9 (Miss. 1843). But where an appeal has been perfected and dismissed for want of prosecution, a subsequent appeal or writ of error is barred. Merrill v. Hunt, 52 Miss. 774 (1876); Smith v. Union Bank of Tennessee, 13 S. & M. 240 (Miss. 1849).
We are of the opinion the former dismissal of the appeal was the result of appellant's inaction and that a second appeal on the same issue is barred. Thus, this assignment of error is without merit.

VI.
Another contention of appellant is that the chancellor erred in dismissing, without prejudice, Spain's cross bill seeking damages against the bank for failure to make the $90,000 loan and for its slanderous and libelous conduct. The motion for dismissal was made after the hearing on jurisdiction of McLemore and at the beginning of the trial against the remaining defendants.
The right to a nonsuit or dismissal is controlled by statute in Mississippi Code Annotated section 11-7-125 (1972) which provides:
Every plaintiff desiring to suffer a nonsuit on trial shall be barred therefrom unless he do so before the jury retire to consider of its verdict.
This section establishes beyond question the right of a complainant to take a voluntary dismissal without prejudice. Bradley v. Graham, 250 Miss. 244, 164 So.2d 772 (1964). This right exists in a party to a suit in chancery until the time when the cause has been submitted to the chancellor for final decision upon its merits. Allison v. Camp Creek Drainage District, 211 Miss. 354, 51 So.2d 743 (1951).
Although the right of a complainant to take a nonsuit is large, it is not unlimited and lies within the discretion of the court. Mitchell v. Film Transit Co., 194 Miss. 550, 13 So.2d 154 (1943). Griffith, Mississippi Chancery Practice, section 534 (2d Ed. 1950), states that a bill may not be dismissed when the defendant has secured some substantial right which will be destroyed by the dismissal. It further states *494 that what constitutes a sufficient right in the defendant justifying a refusal of dismissal has never been embraced by any definite rule and illustrates with the following:
... Where a bill has made a tender or other certain offers and a defendant by his answer has availed of the same, and thereupon joins in the prayer of the bill, or where the rights of infants would be prejudiced by a dismissal; or where interlocutory decrees have already been made adjudging some rights to the defendants upon the merits of some of the issues in the case; or where a motion to dissolve an injunction has been made. But the defendant acquires no rights by the mere fact that he has been put to the inconvenience or expense of a defense... .
(§ 534, p. 551)
Appellant argues that it acquired rights by what had occurred to entitle it to a successful objection against dismissal and cites as support Northern v. Scruggs, 118 Miss. 353, 79 So. 227 (1918), and Mitchell, supra. However, both of these cases involve the rights of minors and are therefore distinguishable from the present case. If the dismissal leaves defendant in the same position that he would have stood if the suit had not been instituted, then the right to dismiss is unimpaired until final submission to the chancellor on the merits. Griffith, supra, at page 551; Northern, supra. We think in the present case that the lower court properly granted a dismissal without prejudice to Spain and that this assignment of error is without merit.

VII.
The last contention of appellant is that the lower court erred in dismissing conspiracy charges against the Alcorn Group. Although the record discloses a wrongful course of conduct by Reed to the benefit of the Alcorn Group, it is void of any evidence of a conspiracy between them. Spain admitted that he knew Reed previously in a business and social manner but this fact coupled with Reed's negligence and wrongful banking transactions is not sufficient to prove a conspiracy. Therefore, we affirm the chancellor in this regard.

VIII.
Alcorn, Inc., Freeman, and Spain cross appeal and assign as error that the chancellor erred in finding that Holiday was entitled to a judgment against Spain and Freeman for $83,970.25, that Alcorn, Inc., and Freeman were not entitled to damages against the bank for libel and slander, and that the bank was entitled to recover from Spain and Freeman on the $52,270 note of June 24, 1974.
Although Spain and Freeman contend that the Holiday note failed because of lack of consideration, Stiner testified that Spain and McLemore requested of him an extension of time for payment for the merchandise. He agreed to extend the payment if, among other things, the Alcorn Group individually executed a promissory note in excess of the amount of the letter of credit. We are of the opinion the note is binding upon Spain and Freeman and affirm the lower court in this regard.
As to the alleged libel and slander, we find insufficient proof in the record to support these charges. Therefore we think this assignment of error is without merit.
Lastly, Spain and Freeman contend they are not liable for the note of June 24, 1974. This note of $52,270 which they signed in their corporate capacity for Alcorn, Inc., and a lesser note of $25,603.50 which they signed individually superseded the original $75,000 note for which they were individually liable.
They argue that a novation occurred which supplanted the liability of Alcorn, Inc., for their personal liability. We have previously discussed the law relevant to novation in No. I. above. In this particular instance, the record discloses that in making the promissory note the bank required the Alcorn Group to convey the .33 acre to Alcorn, Inc., which then gave a deed of trust to the bank as security for the new note. The overriding purpose of the new *495 note was to assist the bank in operating within its loan limits. We are of the opinion that the bank intended to extinguish the original debt and substitute Alcorn, Inc., as a new debtor. Therefore, we reverse the chancellor in this regard.
In conclusion, this Court affirms the decree of the chancellor except as to the date from which interest is due to Holiday by the bank under the letter of credit which we think should run from May 3, 1974, and as to the liability of Spain and Freeman on the $52,270 note of June 24, 1974.
AFFIRMED IN PART, REVERSED AND RENDERED IN PART.
SMITH and ROBERTSON, P. JJ., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.