HACKETT, RECR., APPELLANT, v. KRIPKE ET AL., APPELLEES.

(Decided March 13, 1939.)

*Mr. John B. McMahon* and *Mr. Franklin F. Hayward,* for appellant.

*Messrs. Geer, Lane & Downing,* for appellees.

CARPENTER, J. This is an appeal on questions of law. The record shows that there were two separate issues before the trial court. One, which arose upon

the petition, was the rate of interest chargeable on a promissory note; the other, as to set-off presented by the cross-petition, was based upon a claimed contract of a national bank, the payee of the note sued upon, to repurchase for the purchase price certain bonds sold by it to one of the makers of the note.

Trial by jury was waived and the court found for the defendants on both issues, and the plaintiff appealed. The facts and discussion of these matters will be taken up separately.

I. May 26, 1931, the defendants, Jacob M. and Nettie Kripke executed and delivered to The First National Bank of Toledo, Ohio, a national banking association (hereinafter called the bank), a promissory note for $7,000 due in one year with interest at 6 per cent "to be computed and paid quarterly" with this further provision:

"The said note, after its maturity, shall continue to draw interest at the rate of eight per cent per annum, to be computed and paid semi-annually, until the principal and accrued interest thereon is fully paid."

Some time prior to November 27, 1933, a conservator was placed in charge of the bank. The exact date this was done does not appear in the record. By endorsement on the note under that date the first interest received by him was for the quarter ending November 26, 1933. On April 3, 1934, the plaintiff, John W. Hackett, was appointed receiver for the bank, which he then took over for liquidation. (He will be referred to herein as the receiver.)

There is no dispute about the time or amounts of payments of interest or principal. Prior to the maturity of the note, May 26, 1932, the bank each quarter sent to the makers statements of the quarterly interest due, which were promptly paid. After maturity, the bank and its conservator continued to send such *quarterly* statements at the rate of 6 per cent. Novem-

ber 30, 1934, the receiver received and receipted for the interest at 6 per cent for the quarter preceding February 26, 1934. These facts are evidenced by the notices sent by the bank and stamped "Paid" by it, and were offered as exhibits by defendants. Thereafter the receiver claimed interest at the rate of eight per cent, and this dispute started, and this petition was filed claiming interest at that rate from maturity, May 26, 1932, subject to the payments made.

The defendants claim that the bank, by quarterly statements which it presented to them and they paid, waived any right it may have had to charge the eight per cent rate, and that the receiver is now estopped from claiming the higher rate.

In the books there are a great number of definitions of the term "waiver," but looking to Ohio law, the opinion in *Marfield* v. *Cincinnati, D. & T. Traction Co.*, 111 Ohio St., 139, 144 N. E., 689, 40 A. L. R., 357, furnishes one suited to this case:

"A 'waiver' is the voluntary surrender or relinquishment of a known legal right or intentionally doing an act inconsistent with claiming it. In the former case it amounts to an agreement and must be supported by a consideration which may be either a benefit to the promisor or a disadvantage to the promisee."

By the conduct of the parties, a new contract with a consideration was made with each quarterly payment of interest after maturity. By the terms of the note, after maturity interest was "to be computed and paid *semi-annually.*" The bank submitted *quarterly* statements of interest then "due." This was in effect saying to the makers each quarter: "You pay your interest quarterly instead of semi-annually as you have a right to do it under the note, and the rate will be 6 per cent instead of 8 per cent"; by paying each demand, the offer was accepted. This resulted in both a

"benefit" to the bank and a "disadvantage" to the makers.

There can be no doubt but that this disposed of one question as to the interest rate during the time the bank was functioning as a going concern. The question left is: Did the conduct of the parties amount to permanent modification of the contract of the note, or was each interest statement a new offer and its payment an acceptance? If the former, it bound both the conservator and the receiver; if the latter, it did not, and neither of them, being merely trustees as they were, for the benefit of the creditors and stockholders of the bank, had power to thus modify the contract.

Interest, as the term is used in common parlance, has two aspects: (a) Money paid by agreement for the use of money; or (b) damages assessable for the detention of money by one from another after it is due.

The former arises only by reason of a contract between the parties and the rate cannot exceed the maximum rate fixed by law; the latter, within the statutory rate limits, may be determined by agreement of the parties, but in the absence of an agreement, the statutory rate prevails. In either event, such rate determines the measure of damages resulting from the detention of the money.

The interest received by the bank before the defendants' note matured was conventional interest of type "a"; that which accrued after maturity, is liquidated damages, type "b". An extended discussion of these two phases of so-called interest is to be found in *Mason* v. *Callender, Flint & Co.*, 2 Minn., 350, 72 Am. Dec., 102, and *Close* v. *Riddle*, 40 Ore., 592, 67 P., 932, 91 Am. St. Rep., 580; *Shoemaker* v. *United States*, 147 U. S., 282, 321, 37 L. Ed., 170, 188, 13 S. Ct., 361.

In some jurisdictions a contractual provision for a higher rate after maturity than is agreed upon before maturity is regarded as a penalty. *Bradford & Son*

v. *Hoiles,* 66 Ill., 517. In other jurisdictions such agreement is void and the creditor can collect only the statutory rate. *Mason* v. *Callender, supra.* In Ohio the agreement is legal, expressly made so by statute (Section 8303, General Code); and if an after-maturity rate is not provided for, the damage rate is the same as the contract rate was (Section 8304, General Code); and if there is no contract rate, it is six per cent per annum (Section 8305, General Code).

As Ohio regards the after-maturity rate as contractual, either express or implied, and not penal, it would seem that each offer of the bank to accept the six per cent rate after maturity and acceptance of the offer constituted an implied modification of the original contract for that period and did not abrogate it. It could amount to no more than as though the parties had expressly agreed upon such limited modification as was done in *North* v. *Walker's Admr.,* 66 Mo., 453, where after maturity the parties agreed upon an extension for a definite time at a lower rate, and when payment was not made at the expiration of the extension, without any action of the parties, the higher note rate became effective.

Several cases are cited by defendants as at variance with this thought, especially *Bradford* v. *Hoiles, supra.* As previously pointed out, in that state an agreement like this one for a higher rate after maturity, while given effect, is regarded as a penalty. As penalties are odious to the law, it seeks to avoid them on any possible pretext; hence that court is consistent with this policy of the law in treating the receipt of the lesser rate as a continuing "waiver" of the penalty. As already suggested in some states, as formerly in Minnesota, public policy (because of its abhorrence of the penalty) makes void such higher, after-maturity rate.

In *Thompson* v. *Gorner,* 104 Cal., 168, 37 P., 900, 43

Am. St. Rep., 81, the higher, after-maturity rate was treated as a contractual matter, not as a penalty, and the oral modification was effective only to the extent it was executed. Under the statute of frauds of that state, the modification could not have executory operation. This case is an authority for the conclusion reached herein that the offer of the bank to accept the lower rate and its payment by the debtors. did waive the higher rate for the periods of such acceptances.

The only other case cited by defendants is that of *Godsmark* v. *Bennett's Estate,* 52 Colo., 198, 120 P., 151, where the increased rate was regarded as contractual, and while the opinion by way of *obiter* says the payee's acceptance of interest at the prematurity rate waives the higher rate, it found the payee had expressly stated her intention to so waive the higher rate, also that the payee did not know the higher rate was in the contract; hence, it was not a part of the original contract. This case cites the Illinois and California cases above discussed.

The principle contended for by the defendants herein that the bank, by its conduct, waived for all time its right to the higher contract rate, would not be to the interest of either borrowers or lenders. It is a well-known practice in the commercial world, especially on long time real estate loans, for the lender in times of easy money to reduce the interest rate on such loans below the contract rate, and as the money market tightens, to resume the agreed rate. If the lender is told he makes such reductions at peril of losing his right to the higher rate, this salutary freedom of action will cease.

This reasoning leads to the conclusion that as to the rate of interest computed on defendants' loan from August 26, 1933, the date from which interest was paid to the conservator, on the undisputed facts, the judgment of the trial court was contrary to law, in that

the rate from that time should have been at the contract rate, eight per cent, and in this respect the judgment is modified.

II. In support of their claimed set-off, Kripkes, by their cross-petition, allege that on or about February 14, 1927, the bank "sold to Jacob M. Kripke three $1,000 bonds issued by The Shore Acres Realty Company for $3,000, and agreed as a part of such sale, and in part consideration for the payment by the defendant, Jacob M. Kripke, of the sum of $3,000, that said defendant, in case he would at any time consider it necessary that he have the amount of money paid for said bonds, could return said bonds to it and it would accept the return of the same and pay him the amount of money which he had paid for the same"; that in May, 1931, he considered it necessary that he have the amount of money paid for the bonds and tendered them to the bank and demanded payment of $3,000, which was refused, and that the bonds are now of no value. All of this is denied by the receiver in his answer.

From the evidence it appears that in this transaction Kripke, who was a customer of the bank, bought the bonds in question, which were not listed on the bond market, and $4,000 of bonds of the republic of Bolivia which were listed and are not involved in this controversy. At the time he held a certificate of deposit for $12,000 issued to him by the bank, and to pay for these bonds this was cashed and, after adjustment of accrued interest on the bonds and the certificate, he received from the proceeds the bonds and another certificate of deposit for $5050. This deal was made in the office of the bank with a man who was vice-president of the bank, and, as such, active in the operation of it and the one with whom Kripke usually dealt in his banking transactions there. Kripke claims he was given to understand and did understand that

he was dealing with the bank, but it now claims the sale was not by the bank, but by a subsidiary corporation, First Securities Company of Toledo, Inc., which was owned and operated by the bank and in its offices.

From the evidence it also appears that in May, 1931, Kripke was indebted to the bank on various obligations, and to secure some of them he had previously deposited the Shore Acres bonds as collateral. At that time the bank pressed Kripke to reduce his indebtedness to it and he demanded that it take back these bonds and credit him with $3,000, their purchase price. This was refused, and the bank claimed it had made no such agreement.

Various errors are assigned and urged relating to the weight and sufficiency of the evidence, but from the record there appears a sharp conflict in the evidence on the issue as to who made the sale, the bank or the subsidiary company, and the trial court having found this fact issue in favor of the defendants, this court cannot say that finding is against the weight of the evidence. In the further consideration of questions herein this will be accepted as a settled fact.

Another assigned and urged error is that the judgment is contrary to law, and under this head it is claimed the contract to repurchase the bonds relied upon by defendants was *ultra vires* of the bank.

The defendants contend that this defense, not having been pleaded by the bank, was not an issue for the consideration of the court. However, such special plea is not required if the want of authority is affirmatively shown on the face of the complaint. 5 Thompson on Corporations (3 Ed.), 100, Section 3268; *Perryman & Co.* v. *Farmers' Union, Ginning & Manufacturing Co.*, 167 Ala., 414, 52 So., 644.

The alleged contract is fully described in the cross-petition, as one by the bank to repurchase the bonds, and if as so described an *ultra vires* contract is dis-

closed, that fact is affirmatively shown on the face of the complaint and that defense need not be expressly pleaded.

This situation gives rise to two questions:

1. Was the contract described in the cross-petition *ultra vires* of the bank? If so,

2. Can the defendants recover under it their claimed set-off, as pleaded?

At the time this contract was made, the pertinent powers of a national bank were stated in Section 5136, U. S. Revised Statutes, as follows:

"Seventh. To exercise * * * all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this chapter."

The defendants do not seriously contend that it was within the powers of the bank to make the contract described, which was, in effect, a guaranty of the bonds, and a loan of the bank's credit. Nor do the defendants now contend they can stand upon that contract and recover damages for its breach. Such a contract is void and on no basis can there be a recovery upon or under it. The law in these respects is definitely settled. *Howard & Foster Co.* v. *Citizens National Bank,* 133 S. C., 202, 130 S. E., 758, and cases and authorities there cited; *Greene* v. *First National Bank,* 172 Minn., 310, 215 N. W., 213, 60 A. L. R., 814.

However, the defendants now contend that the bank, having received $3,000 from Kripke on the strength of and induced by such void contract, it was, on demand, liable to him for that amount on an implied obligation to return to him the money it so received.

*Howard & Foster Co.* v. *Citizens National Bank, supra.*

Subsequent to the making of this contract, the federal statute above quoted was so amended as to limit a national bank "to buying and selling without recourse marketable obligations" (44 Stats. at L., 1226, Section 2), and in *Awotin* v. *Atlas Exchange Natl. Bank,* 295 U. S., 209, 79 L. Ed., 1393, 55 S. Ct., 674, where a contract similar to this one was involved, the court said on page 214:

"The contract is invalid because it is within the broad sweep of the statute which by mandatory language sets up definite limits upon the liability which may be incurred by a national bank, in the course of its business of dealing in securities * * *."

And on page 213, it is stated:

"The petitioner, who was chargeable with knowledge of the prohibition of the statute, may not invoke an estoppel to impose a liability which the statute forbids."

The court points out and recognizes the difference between that contract which was expressly prohibited by statute and one merely *ultra vires* as this one, when it said of that contract:

"The invalidity of the contract was not due to the mere absence of power in the bank to enter into it, in which case restitution, not inequitable to the bank or inimical to the public interest, might be compelled. See *Logan County Bank* v. *Townsend, supra,* 74, 75 [139 U. S., 67, 35 L. Ed., 107, 110, 111, 11 S. Ct., 496]; *Hitchcock* v. *Galveston,* 96 U. S., 341, 350 [24 L. Ed., 659, 661]."

In the *Logan County Bank case* the transaction was identical with this except that the claimant sold bonds to the national bank which it promised to return to him on demand for the sale price or less. The court said:

"\* \* \* If the bank's want of power, under the statute, to make such a contract of purchase may be pleaded in bar of all claims against it based upon the contract—and we are assuming, for the purposes of this case, that it may be—it is bound, upon demand, accompanied by a tender back of the price it paid, to surrender the bonds to its vendor."

This principle was extensively discussed in *Howard & Foster Co.* v. *Citizens National Bank, supra,* in which the plaintiff had sued upon the invalid contract, and the court, not being able to treat the case as an action to recover the money received on the implied obligation to return it because the record did not show how much had been received by the bank, remanded the case to the trial court with leave to plaintiffs to amend their complaint to base their action on the implied obligation.

The cross-petition at bar is broad enough in its terms to be treated as one for the recovery of the money the bank received on the invalid contract, and there is no dispute about the amount of money received by the bank or the tender back of the bonds which were in fact at the time in its possession, hence the right of the defendants to their set-off claimed is clear.

A procedural situation similar to this arose in *First Natl. Bank* v. *Mott Iron Works,* 258 U. S., 240, 66 L. Ed., 593, 42 S. Ct., 286, where the recovery sought was allowed and Justice Holmes said:

"\* \* \* In this case therefore the plaintiff is entitled to recover the amount for which it has declared, and as the case was fully tried upon the merits, the distinction between a recovery on the guaranty, as having been necessarily incident to the business. of banking, and a recovery of the amount received by petitioner on account of the guaranty, becomes purely formal."

The bank cites and quotes at length *Kimen* v. *Atlas Exchange Natl. Bank,* 92 F. (2d), 615, in which the plaintiff had as on default obtained a state court judgment against a national bank in liquidation, founded on a repurchase contract like the one at bar. Satisfaction of the judgment could not be had on execution and the judgment creditor, in federal court, brought the suit in equity in the nature of a creditors' bill against the bank and its stockholders. The equitable defense, that the contract which was the basis of the state court judgment was invalid, was sustained. That decision supports the bank's contention herein, which is conceded by the defendants, that the repurchase contract was illegal and cannot be the basis of a judgment. As the *Kimen case* arose in federal court in the manner it did, there was no occasion for that court to consider the possible liability of that bank to the plaintiff on the implied obligation to return the money it had received on the illegal contract, and no mention is made of it in the opinion.

There is a limit to the time within which the implied liability to return property received under an *ultra vires* contract can be enforced. This, no doubt, is a reasonable time. The question whether the four years and three months that elapsed from the making of this contract in February, 1927, to May, 1931, when demand for return was made, was an unreasonable time, is not raised in this court, and the record does not show it was urged in the lower court; if it was, that court must have decided it not unreasonable under the circumstances.

The plaintiff by answer to the cross-petition did plead the six-year statute of limitations (Section 11222, General Code). Whatever cause of action defendant may have had did not arise until he tendered the bonds back to the bank and demanded return of his money. This he did in May, 1931, and his cross-

petition was filed January 11, 1936, and well within the six-year limitation.

Keeping in mind the principles that the defense of *ultra vires* by a corporation "does not commend itself to favorable consideration" (*Larwell* v. *Hanover Savings Fund Society*, 40 Ohio St., 274, 285), and that pleadings must be liberally construed to accomplish the ends of justice, this cross-petition was properly treated as stating a cause of action on the implied obligation and the judgment of the trial court on this branch of the case was not contrary to law.

The judgment of the trial court will be modified as to the computation of interest as herein indicated, and as so modified affirmed.

*Judgment modified and affirmed as modified.*

OVERMYER, J., concurs.

LLOYD, J., not participating.