In re James Ross HARTLEY, Individually and dba Hartley Trucking, and Sharon Hartley, Debtors.

The TOLEDO TRUST COMPANY Successor-in-Interest to The Peoples Bank, Carey, Ohio, Plaintiff,

v.

The PEOPLES BANKING COMPANY, Quentin M. Derryberry, II, Trustee, and Paul A. Burson, Defendants.

Bankruptcy No. 81–01855.
Adv. No. 83–0838.

United States Bankruptcy Court, N.D. Ohio, W.D.

Aug. 29, 1985.

As Corrected Sept. 10, 1985.

Reginald S. Jackson, Steven Smith, Toledo, Ohio, for The Toledo Trust Co.

William E. Clark, Thomas Drake, Findlay, Ohio, for Peoples Bank of McComb.

Mark Kreitman, Mark E. Thomas, Chicago, Ill., for Trustee.

Quentin M. Derryberry, II, Wapakoneta, Ohio, trustee.

Russell E. Rakestraw, Findlay, Ohio, for Paul Burson.

## OPINION AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on to be heard upon the complaint of The Toledo Trust Company (Toledo Trust) for declaratory judgment to determine the competing claims of defendants Paul A. Burson (Burson), Quentin M. Derryberry, II (Trustee) and The Peoples Banking Company, McComb, Ohio (McComb Bank) to a fund of $480,000.00 plus accumulated interest which are the proceeds from the sale by the Trustee of 6,000 shares of common stock of the Peoples Bank, Carey, Ohio (Carey Bank). The Court finds that the McComb Bank is entitled to the proceeds by virtue of its perfected security interest in the stock.

## FACTS

In 1980 James Ross Hartley (Hartley), the Debtor in this bankruptcy case, entered into an oral agreement with Burson concerning the purchase of shares of stock in the Carey Bank. While all of the parties agree that both men contributed money to this venture, the purpose and the details of this agreement are in dispute. Burson claims the plan was for each man to contribute one half of the purchase price and in return receive one half of the stock in their name. According to Burson's version, once a buyer was found for the Bank each man was to share equally in the profits. Hartley claims the original agreement called for all of the stock being issued in his name with Burson providing all of the funds to purchase the stock. According to this story, Burson was to be reimbursed for his purchase price and was to receive one half of the profits. Hartley testified that at some point the arrangement changed so that he was required to pay for approximately one half of the stock but it was still to be issued in his name alone.

McComb Bank and the Trustee assert that Burson was part of a tax avoidance scheme which required him to advance all of the money for stock purchases with the stock being issued in Hartley's name. Then, when the stock was sold, Hartley would be able to write off his operating loss from the trucking business against the profit realized from the sale of the stock. According to this theory, Hartley would then return the purchase price along with one half of the profits, tax free, to Burson. Testimony at trial established that when this tax avoidance scheme was offered to other parties they refused to participate.

The first of the stock purchases made by Hartley and Burson occurred on September 6, 1980. The number of shares purchased was 1,360 for a total price of $79,000.00. Burson paid $75,000.00 while Hartley provided $4,000.00. The stock certificate was issued in Hartley's name.

The second stock purchase took place on September 23, 1980, and involved 1,230 shares. This purchase required a total of $86,100.00 with Burson paying $85,000.00 and Hartley paying $1,100.00. Again the stock certificate was issued in Hartley's name alone.

Burson and Hartley desired a third purchase of 3,270 shares of unissued stock of the Carey Bank at a price of $70.00 per share. However, this purchase would have made their ownership over 10% of the Bank's outstanding stock. According to the regulations of the Federal Deposit Insurance Corporation (FDIC), when an acquiring party or parties are to purchase more than ten percent of a bank's stock, the FDIC must be notified and approve such acquisition.

On September 17, 1980 Hartley and Burson completed the FDIC form for "Notice of Acquisition of Control" which was filed on the purchase of 3,370 shares and indicated that Hartley and Burson would each become owners of 1,168 shares to be acquired from the Carey Bank. Hartley mailed the form along with FDIC Form 6200/06, Supplement Financial Report and the required biographical information for both Hartley and Burson.

On November 5, 1980, FDIC approval of the acquisition was mailed to Burson's office (as per the instructions contained in the FDIC form) with the letter being addressed to Hartley as authorization to the acquiring parties to proceed with their purchase.

Upon Burson's inquiry on November 10, 1980, the President of Carey Bank, Calvin F. Thome (Thome) indicated the bank would sell the stock but not until after December 1, 1980 because it would be unfair to allow Burson and Hartley to receive a dividend due December 1, 1980 when they had held the stock for less than a month.

The third purchase consisting of 3,270 shares of unissued Carey Bank stock occurred on December 2, 1980 for a price of $228,000.00. Burson obtained a bank loan of $75,000.00 which he applied to the purchase price. Hartley paid the remaining $153,900.00 from a $300,000.00 cashier's check which he obtained from the McComb Bank. Hartley was given the $300,000.00 cashier's check in exchange for his personal check. Burson, upon his return from Florida discovered that the stock certificate was issued in Hartley's name only.

The fourth and final purchase of Carey Bank stock occurred on December 19, 1980 and was made by Burson alone. The shares numbering 480 were purchased for $35,040.00. Burson had the stock certificate issued in his name. Subsequently Burson transferred 130 of these shares into Hartley's name, for which Hartley paid $2,500.00.

Larry K. Miller (Miller), former President of the McComb Bank, testified that the personal check Hartley gave in return for the $300,000.00 cashier's check was returned because there were not sufficient funds in the account to cover it. Miller also stated Hartley delivered 6,000 shares of Carey Bank stock to the McComb Bank sometime in December of 1980.

On February 6, 1981, Hartley obtained a $550,000.00 loan from the McComb Bank. As part of the loan agreement Hartley pledged the 6,000 shares of Carey Bank stock.

In February, 1981, Burson received a $245,000.00 promissory note from Hartley, backdated to October 1, 1980, for the money advanced by Burson in conjunction with their stock purchase agreement plus other previous obligations. Burson later accepted payments from Hartley which he applied against the note.

Also, in February, Burson claims to have called Miller and told him of their arrangement. At trial a letter dated February 21, 1981, was introduced to acknowledge that phone call. The letter which was sent after the stock was pledged said, "He [Hartley] and I have a full understanding on the rights of each of us to these shares, and I know that you hold it all covering some current indebtedness." Thus Burson acknowledged that he knew the stock had been pledged to McComb Bank.

On June 2, 1981, Hartley repledged the shares of stock along with other property to cover a 1.2 million dollar overdraft in his checking account at the McComb Bank. This pledge was secondary to the February 6, 1981 pledge and was a joint pledge in conjunction with other lenders.

Hartley filed a Chapter 7 bankruptcy on September 7, 1981. By order of this Court, Quentin M. Derryberry, II was appointed Trustee.

On February 28, 1982, Burson filed a proof of claim for $245,000.00 based on the unsecured promissory note signed by Hartley in February, 1981.

In April, 1982, Carey Bank merged with The Toledo Trust Company. The Toledo Trust Company paid $480,000.00 for the 6,000 shares of Carey Bank stock which are the subject of this case. Then on December 2, 1983, Toledo Trust filed a complaint for declaratory judgment as to the ownership of stock and subsequent proceeds.

## DISCUSSION

Burson claims that he is the equitable owner of one half of the proceeds of the sale of the stock by the Trustee to Toledo Trust. McComb Bank claims it is entitled

to all of the proceeds by virtue of its perfected security interest. McComb Bank has filed a counterclaim against Toledo Trust alleging a right of indemnification should Burson be determined to be the owner of a portion of the shares. The Trustee asserts a right to the entire proceeds claiming both Burson and McComb Bank's claims are invalid.

## ATTORNEY PAUL BURSON'S CLAIM

Burson claims he is the equitable owner of 2,995 shares of the Carey Bank stock by virtue of a constructive trust and is thereby entitled to receive one half of the proceeds obtained by the sale of said stock to Toledo Trust. Burson bases his claim on the fact that he gave Hartley $237,245.00 to purchase the stock. None of the parties dispute Burson's monetary contributions for the stock.

■ The first task is to determine what the agreement between Hartley and Burson was. The Trustee and McComb Bank contend that Burson's claim to the proceeds, based on an oral agreement, is barred by the statute on frauds because no written document exists. O.R.C. § 1308.30 (1962) (U.C.C. § 8–319) (current version at O.R.C. § 1308.34 eff. 9–20–84) provided:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(A) there is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

(B) delivery of the security has been accepted or payment has been made, but the contract is enforceable under this provision only to the extent of such delivery or payment;

The undisputed fact that payment was made by Burson permits evidence of an oral agreement according to subsection (B). The following cases although from different states interpreted statutes modeled after UCC § 8–319 just as the Ohio Revised Code § 1308.30 was. *See Karanian v. Maulucci*, 185 Conn. 320, 440 A.2d 959, 33 UCC Rep.Serv. 677 (1981). *Bowers Steel, Inc. v. DeBrooke*, 557 S.W.2d 369, 23 UCC Rep.Serv. 153 (Tex.Civ.App.1977). Those cases hold that payment removes an oral contract from the statute of frauds. Having found that Burson and Hartley could have agreed on a stock purchase the question remains what did they agree to?

There is considerable dispute as to the terms of the agreement between Hartley and Burson and the knowledge of third parties concerning that arrangement. Hartley maintains Burson was to provide the purchase money with the stock being issued in Hartley's name. In return with his purchase price Burson was to receive one half of the profits realized from any subsequent sale. On the other hand, Burson claims he was to pay half of the purchase price, have half of the stock issued in his name and receive half of the profits accordingly. McComb Bank and the Trustee assert that the arrangement between Hartley and Burson was to avoid taxes. They claim the stock was to be issued to Hartley so that when the stock was sold Hartley would be able to write off his operating losses from the trucking business against the profit realized from the sale. According to McComb and the Trustee, Hartley would then return the purchase price and half of the profits (tax free) to Burson.

The evidence adduced at trial supports Hartley's version of the purchase agreement. After each joint purchase the certificate was issued in Hartley's name alone. Burson was not unaware of the situation. In fact, at one point Hartley delivered 1,360 shares over to Burson who later voluntarily returned them. Despite knowledge that each stock certificate was issued in Hartley's name alone Burson took no legal action to assert his alleged rights. Finally, Burson alone purchased 480 shares and then voluntarily transferred 130 shares into Hartley's name. All of Burson's actions are inconsistent with his account of the stock agreement. Burson as an attor-

ney was certainly aware of his rights. Further evidence that Burson did not want to be named on the stock certificates is provided by the fact that after Burson knew of the Security Agreement between the McComb Bank and Hartley he accepted a promissory note for $245,000.00 upon which he later filed a proof of claim instead of attempting to assert legal rights to ownership in the stock. In light of the overwhelming weight of the evidence, the Court must find that Burson agreed that the stock was to be issued in Hartley's name. Having found Burson planned to be a silent partner, the question remains as to the rights of one, who gives another all the indicia of full and complete ownership, against a bona fide purchaser from the apparent owner.

Ohio law has held since the last century that where the owner of stock voluntarily intended that another party be clothed with apparent absolute ownership the owner is estopped from asserting his rights against a bona fide purchaser. See *Combes v. Chandler, et al,* 33 Ohio St. 178 (1877). *See* also *Osborn v. McClelland,* 43 Ohio St. 284, 1 N.E. 644 (1885); *Krebs v. Forbringer,* 10 O Dec.Rep. 506 (1889). One reason the Court in *Combes,* supra, held that bona fide purchasers should be protected against owners who confer apparent ownership on others is:

> that such purchase was made upon the faith of the title which he had apparently given, and that it would be contrary to justice and good conscience to permit him to assert his real title against an innocent purchaser from one clothed by him with all the indicia of ownership and power of disposition. Another reason was, that were the rule otherwise, it would afford opportunities for the perpetration of frauds upon the purchasers from such apparent owners. When one known to be the owner of shares or chattels delivers to another the script or possession of the chattels, together with an absolute written transfer of all his title thereto, he thereby enables him to hold himself out as the owner, and, as such, obtain credit upon and make sales of the property;

and if, after he has so done, the owner was permitted to come in and assert his title against those dealing upon the faith of these appearances, the dishonest might combine and practice the grossest frauds.

■ Naturally, Burson claims that the McComb Bank did not take the stock without notice of his rights. He claims a phone call to Miller (then President of McComb Bank) put the McComb Bank on notice that Hartley could not pledge the stock. Miller admits receiving a phone call but remembers Burson talking in general terms about his arrangement with Hartley. Miller's version is substantiated by a letter he received dated February 21, 1981 and signed by Paul Burson which stated:

> As indicated to you, I raised most of the money for the Peoples Bank, Carey, Ohio, stock purchase except your loan to him, and one half of that stock being really mine as between Jim and I at least as to equitable ownership.
>
> We purchased 1360 shares, 4500 shares, and 480 shares. Of the latter 480 shares, only 130 were put in Jim's name and 350 in mine, since it took 130 shares to show 6,000 shares in Jim's name. He and I have a full understanding on the rights of each of us to these shares, and I know that you hold it all covering some current indebtedness.

On the basis of Miller's testimony, the February 21st letter and the agreement between Burson and Hartley, the Court finds that the McComb Bank took the stock as a bona fide purchaser.

The February 21st letter began by stating, "Confirming our telephone conversation this date" thus providing that the first confirmable proof that Burson talked to Miller came after the stock had been pledged. Therefore, the McComb Bank accepted the stock on February 6, 1981 without notice of an adverse claim.

Also proven by the February 21st letter is the fact that Burson knew the bank held the stock as security for Hartley's loan yet he never challenged the Bank's position.

Despite all of the shares being in Hartley's name with the bank holding them as security Burson's letter was friendly and it gave no indication that he was asserting rights opposing the bank's possession. Only being entitled to share the profits, it is questionable that Burson had a right to inform Hartley how to run the business and thus their silent partnership agreement may have precluded Burson from objecting to the stock pledge. Whatever rights were given by the agreement it is clear that not only was Burson's notice untimely, but he also did not assert an adverse claim.

Although Burson mentioned he had equitable ownership he never claimed his position was in conflict with the McComb Bank's security interest. Judging by the letter Burson's attitude was friendly and he made no formal protest of the Bank's possession of the stock. In addition, his general reference to an arrangement could easily have meant he was hoping for half of the profits but that he also had a promissory note to rely on. Since Burson was the only person Miller could expect to object to the stock pledge the fact that Burson did not means that Miller did not have notice of an adverse claim and furthermore it amounted to a waiver of any rights he may have had.

■ Any equitable interest Burson may have asserted in the proceeds was waived by his failure to challenge the issuance of the stock in Hartley's name and his acquiesence to Hartley's stock pledge to the McComb Bank. A waiver is an intentional relinquishment, either express or constructive, of a known right, or such conduct as warrants an inference of relinquishment of such right. *Estoppel and Waiver*, 42 O.Jur.3d § 93, p. 154. The Ohio Supreme Court held a waiver can occur in the following manner:

> It may be made by express words or by conduct which renders impossible a performance by the other party, or which seems to dispense with complete performance at a time when the obligor might fully perform.

*White Co. v. Canton Transportation Co.,* 131 Ohio St. 190, 2 N.E.2d 501, 505 (Ohio Sup.Ct.1936). Another Ohio court held that:

> waiver is the voluntary surrender or relinquishment of a known legal right or intentionally doing an act inconsistent with claiming it.

*Hackett v. Kripke,* 62 Ohio App. 89, 23 N.E.2d 438, 439 (Ohio Ct.App.1939).

After each stock purchase Burson knew the stock was not issued in his name. As an attorney, he knew that this was a breach of his alleged verbal agreement with Hartley, and that, to the extent his agreement was enforceable at all, the law would provide a remedy. Yet he did nothing to protect his alleged interest in the stock. To the contrary, in February, 1981, he accepted an unsecured promissory note from Hartley. In addition to the note Burson acknowledged the fact that the Bank held the stock without complaining or taking legal action. This conduct both "seemed to," and did in law, amount to a waiver. It was a voluntary relinquishment of an asserted known legal right, inconsistent with any claim of fraud regarding title to or interest in the stock.

■ Burson also argues that Hartley's pledging the stock was a "wrongful and fraudulent usurpation" of his property. Courts interpreting Ohio law have held that parties may waive their rights to assert fraud "by failing to vigorously and promptly challenge an allegedly fraudulent misappropriation." *FDIC v. Timbalier Towing Co.,* 497 F.Supp. 912, 926 (N.D.Ohio 1980); *see, Meyers v. Hoops,* 140 N.E.2d 65 (Ohio Ct.App.1955). Burson's inaction from September 6, 1980 until March 2, 1982 with full knowledge that Hartley's actions indicated that he was the holder of both the legal and equitable title to the stock constitutes independent grounds for waiver of his claim to the proceeds. Therefore, Burson is left to rely solely on the unsecured promissory note to recover the funds he advanced to Hartley.

## CLAIM OF PEOPLES BANK OF McCOMB

■ The McComb Bank bases its claim to the proceeds on a perfected security interest. On February 6, 1981, the McComb Bank loaned Hartley $550,000.00. Hartley secured the promissory note by the delivery and assignment to the McComb Bank of 6,000 shares of stock in the Carey Bank. The $550,000.00 loan paid a $185,000.00 debt Hartley incurred on October 25, 1980, a $300,000.00 debt incurred on December 2, 1980, (of which $153,900.00 paid for Carey Bank stock) and $65,000.00 in new money. The McComb Bank also had a secondary pledge granted in the stock on June 2, 1981.

The stock was actually in the Bank's possession in 1980 and it remained there continuously until it was sold. McComb Bank relies on O.R.C. § 1309.24 (1979) (current version § 1309.24 eff. 9–20–84) which provided:

A security interest in letter of credit and advices of credit, as provided in division (B)(1) of section 1305.15 of the Revised Code, goods, instruments, negotiable documents, money, or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in sections 1309.01 to 1309.50 of the Revised Code. The security interest may be otherwise perfected as provided in sections 1309.01 to 1309.50 of the Revised Code, before or after the period of possession by the secured party.

The Court has determined that Burson is a general unsecured creditor relying solely on his proof of claim. The Court further finds that the McComb Bank is entitled to the proceeds based on the stock pledge it took from Hartley on February 6, 1981 because it was a purchaser for value without knowledge of an adverse claim and therefore it acquired the status of a bona fide purchaser. As to the Trustee the Court finds the McComb Bank must prevail against his numerous claims which are considered in the following discussion.

## TRUSTEE'S POSITION

The Trustee alleges that the McComb Bank interest is unsecured for the following reasons:

1. That the McComb Bank's claim to a security interest in the proceeds is based on an illegal contract because the Bank had exceeded the single loan limit as prescribed by O.R.C. § 1107.23.

2. That Hartley did not intend to grant the McComb Bank any security interest in the stock.

3. That the McComb Bank's security interest is voidable as a preferential transfer to an insider.

4. That the McComb Bank's security interests are voidable as fraudulent conveyances.

5. The McComb Bank's claim should be equitably subordinated.

## ILLEGAL OVERLIMIT LOAN

■ The Trustee's first argument is that the February 6, 1981 loan was unenforceable because the McComb Bank could not legally lend Hartley $550,000.00. While not disputing the fact that it made overlimit loans to Hartley on February 6, 1981, the McComb Bank contends that the courts recognize such lending limit restrictions as protection for shareholders and not as a means of avoiding repayment to the Bank.

The Ohio Revised Code limits the amount a bank can lend any one borrower in § 1107.23 (1968) (current § 1107.23 eff. 12–13–84), the pertinent parts of which are A(1) and D(6) which provided as follows:

(A) A bank or society for savings shall not at any time lend to, acquire, or hold the obligations of any one borrower, of

the types specified in this section, in an amount which when added to all other such obligations then held would exceed:

(1) In the case of a bank, ten percent of the paid-in capital, surplus, and capital securities. In making computations under this section only such amount of capital securities shall be considered as does not exceed an amount equal to the bank's capital and surplus;

\* \* \* \* \* \*

(D) The restrictions laid down in division (A) of this section do not apply to:

\* \* \* \* \* \*

(6) Obligations representing loans secured upon improved farm property with buildings in the manner and to the extent required under section 1107.19 of the Revised Code, with respect to loans secured by real estate.

On February 6, 1981, the McComb Bank's lending authority pursuant to § 1107.23(A)(1) could not exceed $197,-000.00. It is undisputed the Bank loaned Hartley $550,000.00.

Pursuant to O.R.C. § 1107.23(A)(1) the McComb Bank could not legally lend Hartley $550,000.00 secured solely by the stock. The note which evidenced the loan provided that the collateral securing the $550,000.00 loan was "223.9 acres of farm fround (sic), Wyandot County as described in mortgage deed." The 223.9 acres of farm land was owned by C. Richard Gottfried and Mary Ellen Gottfried. The farm land would have made the loan legal if Miller and the Gottfried's had not executed an addendum to the note.

The addendum provided that the McComb Bank would not foreclose on the 223.9 acres regardless of any default and that the McComb Bank would cancel the mortgage on the land on November 3, 1981, the date the note was due regardless of default. In fact, the McComb Bank did release its mortgage on the farm land in March, 1982, in exchange for $18,000.00 from the Gottfried's despite the fact that approximately $490,000.00 was still unpaid. The addendum, which was executed un-known to the directors of the McComb Bank, had the effect of making this loan in violation of O.R.C. § 1107.23.

The McComb Bank admits the February 6, 1981 loan was in excess of the legal limit. However, the McComb Bank relies upon a line of cases that hold borrowers will not be permitted to avoid repaying loans because they are in violation of single loan limits. The Courts have ruled that denying the lender its funds results in harm to the shareholders whom the law was designed to protect. This line of reasoning was stated long ago in *Union Gold Mining Co. v. Rocky Mountain National Bank*, 96 U.S. (6 Otto) 640, 642, 24 L.Ed. 648, 649 (1878).

We do not think it required by public policy, or that Congress intended that an excess of loans beyond the proportion specified should enable the borrower to avoid the payment of the money actually received by him. This would be to injure the interests of creditors, stockholders and all who have an interest in the safety and prosperity of the Bank.

Similarly, in *First Am. Nat. Bank of Iuka v. Alcorn, Inc.*, 361 So.2d 481 (Sup.Ct. Miss.1978) the Court, in ruling on the enforceability of a loan in excess of the lending limits, cited *Bank of College View v. Nelson*, 106 Neb. 129, 183 N.W. 100 (1921) which held as follows:

In limiting the amount of an individual loan ... the statute established a rule for the government of the bank.... The penalty for violating the act applies to 'any officer, director, or employee' of the bank. An excessive loan does not subject the borrower to a penalty. He does not stand before the statute in the same light as the offending banker. The penalty is a matter between the state and the lender. The general rule is that an excessive borrower cannot prevent the collection of his debt by pleading and proving a violation of the statute.

361 So.2d at 487.

The Trustee cites four cases which hold agreements in violation of loan limit statutes to be void. However, the Court be-

lieves that each case is distinguishable from the present case and furthermore that at least three of them support the position of the McComb Bank. The first case relied on by the Trustee is *Jaynes v. First National Bank of Ketchikan, Alaska.* 236 F.2d 258 (9th Cir.1956). In *Jaynes* the Court refused to enforce the executory portion of a contract because the person seeking enforcement knowingly intended to violate the lending limit. But the Court went on to state "However the whole transaction is not void. Consideration for the Bank's depositors allows it to recover for the money advanced along the way." 236 F.2d at 260. The second case, *First American National Bank of Iuka v. Alcorn, Inc.,* 361 So.2d 481 (Sup.Ct.1978) also supports the position of the McComb Bank. The Court in *Alcorn* stated, "A loan by National Bank in excess of the restriction is not void as to the borrower but subjects the Bank and its officers to penalties upon action of the Government." 361 So.2d at 489. The third and fourth cases *Dove Creek State Bank v. Lawrence Warehouse Co.,* 157 Colo. 263, 402 P.2d 369 (1965) and *Oakes National Bank v. Farmers' State Bank,* 52 N.D. 49, 201 N.W. 696 (1924) were actions between banks. In *Dove Creek* although the Court refused to enforce the contract against another bank to the extent it was in excess of the legal lending limit it also held "neither does what we say today afford a borrower with a defense to an action by a bank on an excessive loan. The law is clearly to the contrary." 402 P.2d at 377. Finally, *Oakes* was another case which also refused to enforce an agreement between banks.

The present case is neither between banks nor does it involve an executory contract. The case law and the state code enforce loans in excess of the legal limit because the law was enacted to protect shareholders. O.R.C. 1101.06 provides in part:

> It is hereby declared to the purpose of the general assembly in enacting Chapters 1101., 1103., 1105., 1107., 1109., 1111., 1113., 1115., 1117., 1119., 1121., 1123., 1125., 1127., and 1129. of the Revised Code.

* * * * * *

> (B) To provide for the protection of the interests of depositors, creditors, shareholders, and the general public in banks doing business in this state;

In keeping with the case law and the intent of the O.R.C. the court finds that the McComb Bank is entitled to payment on the February 6, 1982 loan.

## HARTLEY'S INTENT TO GRANT A SECURITY INTEREST

■ The Trustee claimed that Hartley did not intend to grant the McComb Bank any security interest in the stock. Hartley testified at trial that when he delivered the certificates to the McComb Bank in December he only did so to demonstrate that he had no intention of selling them. However, the Court finds that on February 6, 1981 when Hartley received a $550,000.00 loan in exchange for his pledge of the stock he fully intended to grant the McComb Bank a security interest.

## PREFERENTIAL TRANSFER TO AN INSIDER

■ The Trustee argues he has a right to avoid the stock pledge pursuant to § 547 of the Bankruptcy Code (1978) (current version amended 1984) which provides:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of property of the debtor—
>
> (1) to or for the benefit of a creditor;
>
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
> (3) made while the debtor was insolvent;
>
> (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor, at the time of such transfer—
>
> (i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Trustee claims the sole disputed issue is whether the McComb Bank was an "insider" at the time of the transfer. The Trustee to prevail in a preference action must establish all the elements set forth in § 547(b). *G.E. Grogan v. Southwest Textiles, Inc. (In re Glove Mfg. Co.)*, 42 B.R. 489, 491 (Bankr.E.D.Mich.1984). Therefore, without ruling on the existence of the other elements, the fact that the Court finds that the McComb Bank was not an "insider" as contemplated by the Code means that a preferential transfer did not occur.

The Bankruptcy Code at § 101(25) (current version § 101(28) eff. 1984) provided the following definition of "insider":

(25) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control;

While the McComb Bank does not appear to fit any of the four listed descriptions the Trustee contends the definition found at § 101(25) is "flexible and open ended."

In support of a liberal definition of the terms "insider" the Trustee cites the Court to 11 U.S.C. § 102(3) and *In re Montanino*, 15 B.R. 307 (Bankr.D.N.J.1981). Section 102(3) provides that the term "includes" is

not limiting. The *Montanino* case found that the parents of the woman the Debtor was living with qualified as "insiders." While the Court agrees the definition of "insider" found at § 101(25) is not all inclusive it does not believe the McComb Bank is an "insider" as contemplated by the Code.

The legislative history of § 101(25) (1978) (current version at § 101(28) (1984) provides that:

An insider is one who has a sufficiently close relationship with a debtor that his conduct is made subject to close scrutiny other than those dealing at arms length with the debtor.

S.Rep. No. 989, 95th Cong., 2nd Sess. 25 (1978) and H.R.Rep. No. 595, 95th Cong. 1st Sess. 312 (1977), reprinted in U.S. Code Cong. & Admin. News, 1978, pp. 5787, 5810, 6269.

The Trustee in support of his position that the McComb Bank was an insider relies on subsection (28)(A)(iv) and thus contends that the McComb Bank was a corporation Hartley was in control of. To prove his point the Trustee provided evidence at trial that among other things Hartley was able to instruct Miller or other McComb Bank employees to fill in the amount of depository transfer checks and to deposit them into his account. He also provided other examples of the close relationship of Miller and Hartley to show that their dealings were not at arm's length.

Two cases from the Bankruptcy Court in the Western District of Oklahoma have considered whether a Bank was an insider as to a creditor corporation. These cases are applicable to the present matter because they examine the Debtor/Creditor relationship of a Bank and its customer in light of the type of control that must be shown to qualify an entity as an insider.

The first case was *Schick Oil & Gas, Inc. v. Deposit and Insurance Corp. (In re Schick Oil & Gas, Inc.)*, 35 B.R. 282, 285 (Bankr.W.D.Okla.1983). *Schick* held:

"even though the Bank may have obtained some concessions from the Debtor based on the loan transactions between them

... [no] evidence [exists which raise] these concessions to the level of a special relationship which would characterize the Bank as an "insider" for purposes of § 547. *Matter of Jefferson Mortgage Co., Inc.,* 25 B.R. 963, 976 (Bankr.D.N.J. 1982); see also *In re Castillo,* 7 B.R. 135 (Bankr.S.D.N.Y.1980). Simply because the Bank had financial power over the Debtor does not make the Bank an insider for that reason. The type of control alluded to by the Trustee was an incident of their debtor/creditor relationship. Matter of Jefferson Mortgage Co., Inc., supra. To show control facts must be presented which demonstrate a means of restraint or authority greater than that here."

Again examining whether a Bank was an "insider" in relation to a corporate Debtor the Court in *In re Belco, Inc.,* 38 B.R. 525, 530 (Bankr.W.D.Okla.1984) held that the Debtor was unable to demonstrate that the Bank possessed a "stranglehold" on it so as to render it "powerless to act independently" of the Bank, therefore the Bank was not an "insider." In the case before the Court the Trustee has shown "[b]oth the Bank and the Debtor undertook acts which at best must be related as commercially questionable." *Schick,* supra at 286. However, those acts were not enough to prove the McComb Bank was a mere instrumentality or alter ego of Hartley. In fact, the Bank showed it dealt at arm's length with Hartley when it required the stock be pledged. Therefore, the Court finds the McComb Bank was not an insider and that it had a perfected security interest as of February 6, 1981.

### FRAUDULENT CONVEYANCE

██ The Trustee in his pretrial brief alleged that he would demonstrate at trial that the McComb Bank's security interest in the stock could be avoided pursuant to 11 U.S.C. § 548 as a fraudulent conveyance. Specifically he promised to show the "transactions granting the McComb Bank a security interest in the stock were made with actual intent to hinder delay and de-

fraud creditors." The Court finds that the Trustee failed to prove actual intent at trial.

Absent actual intent, a transfer of the Debtor's property may be avoided by the Trustee in bankruptcy if made under conditions where constructive intent to defraud will be found because the transfer was for less than a reasonably equivalent consideration and the Debtor was or thereby became insolvent, or was engaged in a business with unreasonably small capital, or intended to incur debts beyond his ability to repay as delineated under Code § 548(a)(2) *In re Castillo,* 7 B.R. 135, 137 (Bankr.S.D.N.Y.1980).

██ McComb Bank presented evidence that showed that $550,000.00 was either given to Hartley or used to pay off overdrafts he owed the Bank. The Court finds the Trustee failed to prove the transfer was for less than a reasonably equivalent consideration.

Substituting previously unsecured overdrafts with secured debt seems to be at the heart of the Trustee's argument. A similar situation occurred in *Roemelmeyer v. Intercontinental Bank,* (In re Lucar) 49 B.R. 717 (Bankr.S.D.Fla.1985) where funds were deposited into the Debtor's account and the Bank immediately set off the $147,528.00 unsecured antecedent debt the Debtor owed the Bank. The Court in *Lucar,* 49 B.R. at 718 held "the bank was deliberately given and knowingly received a preferential payment of a part of its unsecured debt. However, I agree with the holdings in the Second and Eighth Circuits that the intent which the Trustee must prove under § 548(a) must be more than a simple intent to prefer a creditor. *Richardson v. Germania Bank,* 263 Fed. 320 (2nd Cir.1919), cert. denied, 252 U.S. 582, 40 S.Ct. 393, 64 L.Ed. 727 (1920); *Irving Trust Co. v. Chase National Bank,* 65 F.2d 409 (2nd Cir.1933); *Sargent v. Blake,* 160 Fed. 57 (9th Cir.1908); *In re Braus,* 248 Fed. 55 (2nd Cir.1917) at 58. This Court concurs with the decision in *Lucar* and therefore it finds the February 6, 1981 loan cannot be

avoided as a fraudulent conveyance pursuant to § 548.

## EQUITABLE SUBORDINATION

The Trustee argues that every aspect of the February 6, 1981 loan was inequitable and as such the Court's refusal to apply § 510(c) to equitably subordinate the Bank's claim to the proceeds would harm the unsecured creditors. The Court while agreeing that the McComb Bank's policies were lax and ill advised is unable to find that the Bank was guilty of fraud, overreaching or inequitable conduct. See *Tinsley and Groom v. West Kentucky P.C.A. and Federal Intermediate Credit Bank of Louisville*, 49 B.R. 85, 12 B.C.D. 1368, 1370 (Bankr.W.D.Ky.1984). *Matter of all Products Co.*, 32 B.R. 811, 10 B.C.D. 1363 (Bank.S.D.Mich.1983).

In order to show that subordination is an appropriate remedy the Trustee must demonstrate the following elements:

1. The claimant must have engaged in some type of inequitable conduct.
2. The misconduct must have resulted in injury to the creditors of the Debtor or conferred an unfair advantage on the claimant.
3. Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

The specific part of the loan which the Trustee views as inequitable is that the Bank replaced unsecured overdrafts with a secured loan. It is true that the loan paid off two overdrafts, one of which was incurred during the last joint purchase of stock. But it is also true that $65,000.00 in new money was advanced by that loan. The Court having already found that the loan was not fraudulent or the result of an insider transaction now turns to whether the Security Agreement was inequitable.

Both parties were independent and dealing at arm's length on February 6, 1981. Miller had concealed his actions of making unsecured loans to Hartley from the directors. However ill advised those loans were neither Miller nor the directors coerced Hartley into taking a $550,000.00 loan. Hartley voluntarily applied for and signed the loan because in his business judgment it was the best plan to keep his business operating. While the McComb Bank did require security that is not unusual for such a large loan. Undoubtedly the Bank using its business judgment made the loan in the hopes Hartley would continue in business and be able to pay off his debts. It is true part of Miller's motivation was to protect himself from Bank examiners but considering that the Bank gave adequate consideration for what it accepted as security it can hardly be said to be inequitable to the unsecured creditors. As the Court in *In re Tinsley & Groom, supra,* stated:

> Giving the greatest weight to the most damaging testimony against the defendant's lending practices establishes only a lending policy which was liberal in approving renewal applications, accepting at face value debtor's projections, relying heavily on the character and ability of the debtors, and financing the debtors' over-zealous goals. Such policy, while perhaps not a sound or prudent lending practice, falls short of imposing culpability for the results which debtors' actions eventually occasioned.

12 B.C.D. at page 1371.

Therefore, it is the opinion of this Court that the Trustee has failed to establish the first element of subordination which requires a showing of fraud, overreaching or inequitable conduct. Having failed to do so the Court denies the Trustee's request to equitably subordinate the McComb Bank's claim.

## CONCLUSION

Toledo Trust filed a complaint for declaratory judgment to determine the competing claims of defendants Burson, McComb Bank and the Trustee. The Court finds Burson is an unsecured creditor who must rely solely on the promissory note to recover the funds he advanced to Hartley. The McComb Bank by virtue of its perfected security interest is entitled to the proceeds

from the sale of the 6,000 shares of stock of the Peoples Bank of Carey. The Court further finds that the Trustee, who asserted every possible argument to dislodge the McComb Bank from its position as a secured creditor, has failed on every ground and, therefore, is not entitled to the proceeds. Finally, the Court finds that Toledo Trust holds the stock of the former Peoples Bank of Carey, Ohio' free and clear of any claims of the defendants.

In light of the foregoing, it is hereby

ORDERED that the Trustee turn over to the Peoples Banking Company, McComb, Ohio, the proceeds from the sale of the stock of Peoples Bank of Carey, including dividends and accumulated interest, free and clear of any liens or claims of the defendants Paul A. Burson or Quentin M. Derryberry, II, Trustee. It is further

ORDERED that the counterclaim of the Peoples Banking Company, McComb, Ohio, against The Toledo Trust Company be, and it hereby is, dismissed with prejudice. It is further

ORDERED that the claims of Paul A. Burson against the Trustee, Quentin M. Derryberry, II and the Peoples Banking Company, McComb, Ohio, be, and they hereby are, dismissed with prejudice. It is further

ORDERED that The Toledo Trust Company, successor-in-interest to the Peoples Bank of Carey, Ohio, have title to the 6,000 shares of stock sold to it by the Trustee free and clear of any and all liens, claims or interests of the defendants Peoples Banking Company, McComb, Ohio, Quentin M. Derryberry, II, Trustee and Paul A. Burson.